(No. 47607.—

FRANKLIN J. LUNDING, Jr., Appellee, v. DANIEL WALKER, Governor, Appellant.

*Opinion filed Nov. 15, 1976.—Rehearing denied Jan. 28, 1977.*

UNDERWOOD and SCHAEFER, JJ., dissenting.

William  J.  Scott,  Attorney  General,  of  Chicago

(Herbert Lee Caplan, Assistant Attorney General, of counsel), for appellant.

Burditt & Calkins (Tom Scheuneman and Wayne R. Andersen, of counsel), for appellee.

Dore & O'Toole, of Chicago (John J. O'Toole, of counsel), for amicus curiae Michael E. Lavelle, Chairman of the State Board of Elections.

Earl L. Neal, of Chicago, for amicus curiae Cecil A. Partee, President of the Illinois Senate, et al.

MR. JUSTICE RYAN delivered the opinion of the court:

In May, 1975, plaintiff was notified by letter from the Governor that he was being "removed as a member of the State Board of Elections for 'neglect of duty.' " The neglect of duty involved plaintiff's failure to file the financial disclosure statement required by Executive Order No. 4—73. Plaintiff sued in the circuit court of Cook County to restrain the Governor from any further action implementing the removal. A temporary injunction was entered prohibiting the Governor or his agents from interfering with plaintiff's performance of his duties as a member of the Board. Defendant appealed from this interlocutory order under Rule 307 (58 Ill. 2d R. 307), and we allowed defendant's petition under Rule 302(b) to transfer that appeal here.

This case requires a determination of the extent of the Governor's power to remove appointed executive officers. Specifically, the issues may be summarized as: (1) Does the removal power of the Governor as set forth in article V, section 10, of the 1970 Illinois Constitution extend to members of the State Board of Elections, and (2) may that power be exercised summarily and without judicial review? We hold that in this particular instance, because of the unique character of the office held by plaintiff, the Governor could only remove plaintiff for cause. Further,

we hold that the determination of the adequacy of the cause for removal is, in this case, judicially reviewable. Consequently, we affirm the issuance of the temporary injunction.

Section 10 of article V of the 1970 Illinois Constitution provides:

> "The Governor may remove for incompetence, neglect of duty, or malfeasance in office any officer who may be appointed by the Governor."

This provision first appeared, in essentially its present form, as section 12 of article V of the 1870 Illinois Constitution. It had been incorporated into that constitution, partially at least, as a response to this court's decision in *Field v. People ex rel. McClernand* (1839), 3 Ill. 79. There it had been held that while the Governor could, with the advice and consent of the Senate, appoint a Secretary of State, he had no corresponding power to remove the Secretary from office. Thus, in explaining the proposed section on removals to the delegates to the 1870 constitutional convention, the chairman of the Committee on the Executive stated:

> "Under the present Constitution the Governor may appoint a person to an important office, and when appointed he has no power whatever to remove him, though he may be incompetent. *** The executive should have some power as well as responsibility, and he should have power enough, at least, to execute the laws; and if he is first to appoint men and be held responsible for his appointments, and then, in case they should prove failures, not have the power to remove then [*sic*], what ridiculous spectacle would be presented. This power of removal is for the benefit of the people and for their security, and not for the glory of the executive." G. Braden & R. Cohn, The Illinois Constitution: An Annotated and Comparative Analysis, 285-86, citing 1 Debates and Proceedings of the Constitutional Convention of the State of Illinois 748 (1870).

The removal provision was first construed in *Wilcox v. People ex rel. Lipe* (1878), 90 Ill. 186, in which members

of the West Chicago Park Commissioners challenged their removal by the Governor. There this court said:

> "The constitution is silent as to who shall ascertain the cause of removal or the mode of its ascertainment. It simply gives to the Governor the power to remove any officer whom he may appoint, in case of incompetency, etc. It follows, then, that it is with the Governor, who is to act in the matter, to determine, himself, whether the cause of removal exists, from the best lights he can get, and no mode of inquiry being prescribed for him to pursue, it rests with him to adopt that method of inquiry and ascertainment as to the charge involved which his judgment may suggest as the proper one, acting under his official responsibility, and it is not for the courts to dictate to him in what manner he shall proceed in the performance of his duty, his action not being subject to their revision." 90 Ill. 186, 205.

A close reading of the *Wilcox* decision, however, raises doubts as to the actual breadth of the holding there. In speaking of the adoption of section 12 of article V of the 1870 Constitution, the court stated:

> "We think the intention was to adopt the rule which had become established under the Constitution of the United States with respect to appointments made by the President, but was denied in this State in the case of *Field v. The People,* 2 Scam. 79, arising under the constitution of 1818, namely, that the power of removal was incident to the power of appointment; and that the constitution of 1870 makes the power of removal from office by the Governor co-extensive with his power of appointment." 90 Ill. 186, 198.

In *Ramsay v. VanMeter* (1921), 300 Ill. 193, 201-02, which dealt with the validity of the Governor's removal of the public administrator of Cook County, this court

confirmed that "it was the intention of the framers of the constitution of 1870 to adopt the rule which had been established under the constitution of the United States *** that the power of removal *** was incident to and co-extensive with his power of appointment."

Thus the true holding of *Wilcox* was not that the Governor's removal power was unlimited and unbridled, but that it was "incident to and co-extensive with his power of appointment." And in determining the extent of the power, it was clear that the courts in both *Wilcox* and *Ramsay* had found Supreme Court interpretations of the President's removal power to be analogous and persuasive.

At the time of the adoption of section 12 of article V, and at the time of the construction of that section in *Wilcox,* it was clear from Federal decisional law that "in the absence of all constitutional provision, or statutory regulation, it would seem to be a sound and necessary rule, to consider the power of removal as incident to the power of appointment." (*Ex parte Hennen* (1839), 38 U.S. (13 Pet.) 230, 259, 10 L. Ed. 138, 159.) Further, it was the "settled and well understood construction of the Constitution, that the power of removal was vested in the President alone." *Ex parte Hennen* (1839), 38 U.S. (13 Pet.) 230, 259, 10 L. Ed. 138, 153. See also 2 B. Schwartz, A Commentary on the Constitution of the United States 48 (1963).

The first modern Federal decision construing the extent of the President's removal power was *Myers v. United States* (1926), 272 U.S. 52, 71 L. Ed. 160, 47 S. Ct. 21. That case arose from the removal of a first-class postmaster by the Postmaster General, at the specific direction of the President. Speaking through Chief Justice (and former President) Taft, the court went beyond the President's power to remove a postmaster and "announced the broad doctrine that the Constitution endows the President with an illimitable power to remove all officers in whose appointment he has participated, with the

exception of the federal judges." 2 B. Schwartz, A Commentary on the Constitution of the United States 49 (1963).

Less than 10 years later, however, the court felt obligated to limit the *Myers* case to its specific facts. In *Humphrey's Executor v. United States* (1935), 295 U.S. 602, 79 L. Ed. 1611, 55 S. Ct. 869, the court was presented with the removal by President Roosevelt of a member of the Federal Trade Commission. Humphrey had been removed, according to President Roosevelt, because "the aims and purposes of this Administration with respect to the work of the Commission can be carried out most effectively with personnel of my own selection." Section 1 of the Federal Trade Commission Act (15 U.S.C. sec. 41) provided: "Any commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office."

The court determined that the *Myers* decision should be confined to purely executive officers because "such an officer is merely one of the units in the executive department and hence inherently subject to the exclusive and illimitable power of removal by the chief executive, whose subordinate and aid he is." 295 U.S. 602, 627, 79 L. Ed. 1611, 1619, 55 S. Ct. 869.

In determining whether officers of the Federal Trade Commission should fall within the *Myers* rule, the court noted that:

> "The commission is to be nonpartisan; and it must, from the very nature of its duties, act with entire impartiality. It is charged with the enforcement of no policy except the policy of the law. *** Its members are called upon to exercise the trained judgment of a body of experts 'appointed by law and informed by experience.'
> * * *
> Such a body cannot in any proper sense be characterized as an arm or an eye of the execu-

tive. Its duties are performed without executive leave and, in the contemplation of the statute, must be free from executive control." (295 U.S. 602, 624-28, 79 L. Ed. 1611, 1617-19, 55 S. Ct. 869.)

The court also noted that "one who holds his office only during the pleasure of another cannot be depended upon to maintain an attitude of independence against the latter's will." (295 U.S. 602, 629, 79 L. Ed. 1611, 1620, 55 S. Ct. 869.) Since the "coercive influence [of the power of removal] threatens the independence of a commission" (295 U.S. 602, 630, 79 L. Ed. 1611, 1620, 55 S. Ct. 869), "no removal can be made during the prescribed term for which the officer is appointed, except for one or more of the causes named in the applicable statute" (295 U.S. 602, 632, 79 L. Ed. 1611, 1621, 55 S. Ct. 869).

In 1958 the Supreme Court reaffirmed the holding of *Humphrey's Executor* in *Wiener v. United States* (1958), 357 U.S. 349, 350, 2 L. Ed. 2d 1377, 1379, 78 S. Ct. 1275. Wiener had been removed from the War Claims Commission because President Eisenhower wanted to staff the Commission "with personnel of my own selection." In finding that the removal was unauthorized, the court, relying on *Humphrey's Executor*, commented:

"It drew a sharp line of cleavage between officials who were part of the Executive establishment and were thus removable by virtue of the President's constitutional powers, and those who are members of a body 'to exercise its judgment without the leave or hindrance of any other official or any department of the government,' 295 U.S. at 625, 626, as to whom a power of removal exists only if Congress may fairly be said to have conferred it. This sharp differentiation derives from the difference in functions between those who are part of the Executive establishment and those whose tasks require absolute freedom from Executive

interference." 357 U.S. 349, 353, 2 L. Ed. 2d 1377, 1380-81, 78 S. Ct. 1275.

The court decided that "the most reliable factor for drawing an inference regarding the President's power of removal in our case is the nature of the function that Congress vested in the War Claims Commission." (357 U.S. 349, 353, 2 L. Ed. 2d 1377, 1381, 78 S. Ct. 1275.) Since claims before the Commission "were to be 'adjudicated according to law,' that is, on the merits of each claim, supported by evidence and governing legal considerations, by a body that was 'entirely free from the control or coercive influence, direct or indirect,' *Humphrey's Exr. v. United States,* supra, 295 U.S. at 629, of either the Executive or the Congress" (357 U.S. 349, 355-56, 2 L. Ed. 2d 1377, 1382, 75 S. Ct. 1275), the removal without cause by the President was unauthorized.

Therefore, to summarize the Federal law on removals by the President:

> "Within the executive branch itself, the President must be master, with the complete removal power recognized by the *Myers* case. All officers in the ordinary departments are executive officers within *Myers,* regardless of the nature of the functions which they perform. [Footnote omitted.] Such result is justified by the power of the Congress, at any time, to remove quasi-judicial authority from a department and vest it in an independent agency, whose members would be insulated from unfettered removal under *Humphrey-Wiener.*" 2 B. Schwartz, A Commentary on the Constitution of the United States 55 (1963).

We do not mean to imply by our extensive discussion of Federal law that we feel inexorably bound by Federal decisions in this matter. However, this court in both *Wilcox* and *Ramsay* indicated that it was disposed to follow the Federal rule, and we now find the reasoning of the *Myers-Humphrey's-Wiener* trilogy persuasive. The hold-

ing of *Myers* closely parallels this court's decision in *Wilcox*, and while neither *Humphrey's* nor *Wiener* is directly on point, the same considerations of "independence" make those cases analogous to the case at bar.

As we noted earlier, the section on the Governor's removal power was carried over from the 1870 Constitution with only minor changes. During the debates on that section at the 1970 constitutional convention, however, Delegate Netsch proposed that the section be amended to read: "The governor may remove any officer whom he appoints." (3 Record of Proceedings, Sixth Illinois Constitutional Convention 1325 (hereafter Proceedings).) In explaining her proposed amendment she said:

"[T] he courts have already held that the inclusion of the language 'for incompetence, neglect of duty, or malfeasance in office' is for all practical purposes superfluous, because whenever the governor uses one of those magic words, the Illinois Supreme Court has held—and held some time ago—it has never backed down on this position—that no one may challenge the governor's judgment that someone has been guilty of incompetence, neglect of duty, or malfeasance in office. So for all practical purposes, the governor's removal power is already more or less absolute.

*** Just to illustrate, if one of the governor's cabinet members, a director of a major department, developed either a major policy difference with the governor or even simply a major personality difference with the governor, *** the governor ought to be permitted to remove him and ought not to have to say that the man had been guilty of incompetence, neglect of duty, or malfeasance in office." 3 Proceedings 1325.

Apparently Delegate Netsch was referring to the *Wilcox* case, and perhaps in the example which she gave—an executive officer directly responsible to the Governor—her interpretation of *Wilcox* was accurate.

However, other delegates foresaw situations in which such unbridled power in the Governor was not desirable. In opposing the amendment, Delegate Orlando stated:

"Now, one of the areas where we felt that this provision would help was in those agencies of state government

which are classified as quasi-judicial. We felt that by leaving this provision in there, *** we wouldn't have the governor just arbitrarily reaching in there and dismissing them and creating some kind of a political connotation. He would have to justify the removal of such type of individual under this provision, and this is one of the reasons why it was left in this fashion, rather than as has been suggested by Delegate Netsch." 3 Proceedings 1326.

Clearly, by defeating the Netsch amendment and retaining the "magic words," the convention indicated that the Governor's removal power should not be absolute in all cases. Further, the "Official Text with Explanation," which was submitted to the voters, stated:

"This is a slight revision of Article V, Section 12 of the 1870 Constitution. It means that the Governor may remove *for proper cause* any officer he appoints." (Emphasis added.) (7 Proceedings 2709.)

We cannot believe that the voters who adopted the 1970 Constitution believed that "for proper cause" included the arbitrary and unfettered whim of the Governor.

The State Board of Elections, unlike most other State agencies, boards, and commissions, is constitutionally mandated. Section 5 of article III of the 1970 Constitution provides:

"A State Board of Elections shall have general supervision over the administration of the registration and election laws throughout the State. The General Assembly by law shall determine the size, manner of selection and compensation of the Board. No political party shall have a majority of members of the Board."

It is clear from a careful reading of the transcripts of the Sixth Illinois Constitutional Convention that the delegates contemplated a highly independent board. In proposing this section to the convention, Delegate Keegan stated:

"We need a central election authority, bent to no particular partisan point of view, to implement the policy decisions of the General Assembly.

*** I strongly feel that no single Illinois official *** can possibly serve in a nonpartisan posture in this highly

partisan state ***. Only a multiple board can offer a political balance to guarantee the best climate of decision-making in this highly sensitive area.

*** [We need] a balanced, highly visible, bipartisan, and responsible board of elections, charged with the supervision of election laws and registration throughout the state." 2 Proceedings 1056.

Delegate Cicero, speaking in favor of the proposed section, pointed out that "[n]eutrality in the administration of elections is particularly important. The integrity of no process is more fundamental to the proper functioning of the political system under which we live." 2 Proceedings 1057.

In implementing the constitutional mandate and establishing the State Board of Elections (Ill. Rev. Stat. 1975, ch. 46, art. 1A) the General Assembly obviously sought to negate partisanship as much as possible and to guarantee the Board's political independence.

It is plain that the legislators intended, and the public interest demands, that Board members not be amenable to political influence or discipline in the discharge of their official duties. To subject a neutral, bipartisan, and independent board to the unbridled whim of the Governor under the *Wilcox* rule would destroy its purpose and its efficacy. As the Supreme Court made clear in *Humphrey's Executor*, "it is quite evident that one who holds his office only during the pleasure of another cannot be depended upon to maintain an attitude of independence against the latter's will." (295 U.S. 602, 629, 79 L. Ed. 1611, 1620, 55 S. Ct. 869.) If the holding of this court in *Wilcox* were extended and applied to the removal of the members of the State Board of Elections, the political independence of that body envisioned by the delegates to the constitutional convention and sought to be achieved by the legislature would be jeopardized. We therefore hold that the Governor can only remove a member of the State Board of Elections for cause.

The Governor cited "neglect of duty" as the cause for

plaintiff's removal from membership on the State Board of Elections, and explained that the "neglect of duty" was plaintiff's failure to file a financial disclosure statement in compliance with Executive Order No. 4—73. We hold that because of the independent nature of the Board the question of whether this is sufficient "neglect of duty" to justify the Governor's exercise of his removal power is a question which is properly reviewable by the courts.

This court's opinion in *Wilcox* and the early opinions in other States (see 52 A.L.R. 7 (1928) and 92 A.L.R. 998 (1934)) indicated that the propriety of a governor's exercise of his removal power is not generally subject to review by the courts. In recent years, however, courts have shown an increased willingness to review a governor's determination that cause exists. In *Hall v. Tirey* (Okla. 1972), 501 P.2d 496, the Governor of Oklahoma had removed a member of the State Board of Property and Casualty Rates. The court found that "the Legislature intended to create an independent administrative board free of the influence that a Governor can assert if the board's members serve at his pleasure," and therefore a removed member "is entitled to have the courts decide whether his removal complied with the standards established by the Legislature ***." (501 P.2d 496, 501.) Similarly in *Bowers v. Pennsylvania Labor Relations Board* (1961), 402 Pa. 542, 551, 167 A.2d 480, 484, faced with the removal by the Governor of a member of the State's Labor Relations Board, the court found that "in the public interest, such Board members were not to be made amenable to political influence or discipline in the discharge of their official duties." Consequently, "a party complaining of, or charged with, the commission of wrongs legally re-dressable, [is] entitled, at the very least, to a determination by a tribunal independent of the influence of powerful personages, political or otherwise." 402 Pa. 542, 556, 167 A.2d 480, 486.

While we recognize the factual distinctions between

the cases cited and the case at bar, we note that the same considerations of political independence are present in all three cases. Thus we find the trend evidenced by these cases and by *Humphrey's Executor* and *Wiener* persuasive in holding that, at least in this particular factual setting, the adequacy of the cause cited by the Governor is judicially reviewable.

Since this case is before us on the question of the propriety of a temporary injunction, no hearing has yet been had on the merits. Consequently, we express no opinion on the sufficiency of the cause cited by the Governor in his letter of removal.

The decision of the circuit court of Cook County is affirmed.

*Judgment affirmed.*

MR. JUSTICE UNDERWOOD, dissenting:

I cannot agree with the court's holding that "in this particular instance" and "in this particular factual setting" the Governor's removal power is limited to a judicially reviewable showing of cause. Because of the importance of the question I deem it necessary to state at some length the reasons for my disagreement.

While I do not regard the following facts as particularly relevant in resolving the issues, they do provide a clearer understanding of the sequence of events preceding the removal order. Members of the State Board of Elections are appointed by the Governor, who selects one individual from the two submitted to him by each of the President and the Minority Leader of the Senate and the Speaker and Minority Leader of the House of Representatives. Plaintiff was one of two nominees of the then President of the Senate, Senator William Harris. On November 27, 1973, after receiving the names of the nominees, the Governor requested of plaintiff written assurance that plaintiff would, if appointed, voluntarily comply with the Governor's executive order regarding financial disclosure

(see *Illinois State Employees Association v. Walker* (1974), 57 Ill. 2d 512, *cert. denied*, 419 U.S. 1058, 42 L. Ed. 2d 656, 95 S. Ct. 642). Under a December 5 date plaintiff wrote defendant stating he would, if appointed, "file the required disclosure statements"; as of that date the executive order apparently did not require members of the State Board of Elections to file financial statements with the Board of Ethics created by the Governor. On February 13, 1975, the Governor amended his executive order to require members of the Board, among other agencies, to file such statements. On April 28 plaintiff requested from the Attorney General an opinion whether he, as a member of the State Board of Elections, was subject to the jurisdiction of the Board of Ethics, and, on April 30, in a joint letter with the chairman of the State Board of Elections, requested from the Board of Ethics an extension of time in which to file the financial statements, pending receipt of the Attorney General's opinion. The removal action by the Governor followed shortly thereafter.

The scope of the Governor's removal power under the 1870 Constitution was considered in *Wilcox v. People ex rel. Lipe* (1878), 90 Ill. 186. Section 12 of article V of that constitution provided in part:

> "The Governor shall have power to remove any officer whom he may appoint, in case of incompetency, neglect of duty, or malfeasance in office; ***."

This court there considered whether the removal power was limited to officers as to whom the Governor possessed unrestricted powers of appointment, or to those in whose appointment the Senate must concur, or both. The court held the constitutional language plain: that the Governor had the power to remove any officer whom he may appoint, and that no room for construction existed. Also considered was the question of the necessity for a notice of the charge, hearing and proof prior to removal. As to this the court said:

> "It being found that the power of removal

existed in the Governor, the inquiry remains whether it was validly exercised. Relators say not—that the power granted was judicial in its nature, and should have been exercised according to judicial methods, that is, there should have been a specific charge, notice of it, opportunity for defense and hearing, and proof to support the charge. Undoubtedly, the Governor can only remove for some one of the causes specified; but the removal here was for one of these causes—incompetency. The Governor ascertained the existence of the cause here, and made the removal on account of it. The constitution is silent as to who shall ascertain the cause of removal or the mode of its ascertainment. It simply gives to the Governor the power to remove any officer whom he may appoint, in case of incompetency, etc. It follows, then, that it is with the Governor, who is to act in the matter, to determine, himself, whether the cause of removal exists, from the best lights he can get, and no mode of inquiry being prescribed for him to pursue, it rests with him to adopt that method of inquiry and ascertainment as to the charge involved which his judgment may suggest as the proper one, acting under his official responsibility, and it is not for the courts to dictate to him in what manner he shall proceed in the performance of his duty, his action not being subject to their revision. The constitution of this State not only declares that the powers of the government of the State shall be divided into three distinct departments, but has expressly prohibited the exercise of any of the powers properly belonging to one by either of the others." (90 Ill. 186, 204-05.)

*Wilcox* has been approvingly referred to, albeit in somewhat dissimilar contexts, in *Fiedler v. Eckfeldt* (1929),

335 Ill. 11, and *Ramsay v. VanMeter* (1921), 300 Ill. 193.

The majority opinion emphasizes the reference in *Wilcox* to the Presidential removal power, which was then as unrestricted (*Ex-parte Hennen* (1839), 38 U.S. (13 Pet.) 230, 259, 10 L. Ed. 138, 153; see also *Myers v. United States* (1926), 272 U.S. 52, 71 L. Ed. 160, 47 S. Ct. 21) as the *Wilcox* court held the Governor's removal power to be. Because this court again referred to the Presidential removal power in *Ramsay,* the majority states the holding of *Wilcox* to be that the Governor's removal power under the 1870 Constitution was identical to the President's. Consequently, says the majority, when the Presidential removal power was subsequently restricted by the later cases of *Humphrey's Executor v. United States* (1935), 295 U.S. 602, 79 L. Ed. 1611, 55 S. Ct. 869, and *Wiener v. United States* (1958), 357 U.S. 349, 2 L. Ed. 2d 1377, 78 S. Ct. 1275, to those Presidential appointees whose duties were solely within the executive department and held not to extend to those persons appointed to quasi-judicial bodies for prescribed terms who could be removed only for cause, the Governor's power was somehow similarly limited. Were there any indication in the proceedings of the convention which adopted the 1970 Constitution that the delegates so intended, I could agree. But as I read those debates, the clear intent of the delegates was to continue the rule adopted in *Wilcox*. The majority relies upon the comments of Delegate Netsch in support of her proposed amendment pursuant to which the section on the Governor's removal power would have read: "The Governor may remove any officer whom he appoints." (3 Record of Proceedings, Sixth Illinois Constitutional Convention 1325.) That amendment was defeated, a fact which the majority reads as supporting its conclusion. The action on the Netsch amendment, however, must be considered in the context of the whole of the discussion in order to ascertain its true significance. When that is done it seems to me the intent of the delegates is unmistakably clear that

the Governor's removal power was to remain as unrestricted as *Wilcox* had held it was.

The delegates were fully aware of the *Wilcox* holding and the summary, nonreviewable power of removal held to have been vested in the Governor by the language of the 1870 Constitution. That awareness appears with unusual clarity in the presentation and explanation of the proposed section 22 (now section 10) (3 Proceedings 1324-27) by Delegate Young and in the discussion which ensued:

> "MR. YOUNG: Mr. President and fellow delegates, section 22 is entitled, 'Governor—Removals,' and we have proposed that the section read as follows: 'The governor may remove any officer he may appoint for incompetence, neglect of duty, or malfeasance in office.'
>
> This was—is—presently existing section 12; and all we have done, insofar as that section is concerned, is to clean up the language and make it just a little shorter." (3 Proceedings 1324.)

In the course of answering questions, Delegate Young explained:

> "I might add that the courts have construed this section and authorized the governor to remove a man as long as he states in his letter, or whatever you may want to call it, that he is removing him for one of these reasons. There is no appeal or no inquiry into whether the charge is valid or not, so I would assume that he could remove him if the office was, in effect, abolished. (3 Proceedings 1324-25.)

Delegate Netsch then proposed her amendment and explained her reasons:

> "MRS. NETSCH: Mr. President, my reasons for the amendment are twofold. One, as Mr. Young just referred to, the courts have already held that the inclusion of the language 'for incompetence, neglect of duty, or malfeasance in office' is for all practical purposes superfluous, because whenever the governor uses one of those magic words, the Illinois Supreme Court has held—and held some time ago—it has never backed down on this position—that no one may challenge the governor's judgment that someone has been guilty of incompetence, neglect of duty, or malfeasance in office. So for all

practical purposes, the governor's removal power is already more or less absolute.

I would prefer, however, to remove the words, even though I don't think they constitute a major deterrent to the governor, because I think as a matter of principle the governor should be permitted to remove those officers, whom he is initially authorized to appoint, for any reason whatever, and most particularly not be limited to the three grounds stated. Just to illustrate, if one of the governor's cabinet members, a director of a major department, developed either a major policy difference with the governor or even simply a major personality difference with the governor, it seems to me quite clear that it is impossible for him to continue as head of that major agency and that the governor ought to be permitted to remove him and ought not to have to say that the man had been guilty of incompetence, neglect of duty, or malfeasance in office.

So for both reasons then—for the substantive reason that I think the governor's removal power should be unfettered in those cases where he initially appoints, and because the language is not useful in the second place—I would propose to eliminate it." (3 Proceedings 1325.)

Delegate Davis then inquired:

"MR. DAVIS: Mr. President, I have a point of inquiry, and I don't care who answers it, but I'd like to be informed as to whether this would mean that the governor could remove from office any person who might be appointed to a board or commission—for example, the Election Board that we authorized the other day—at will, even though they were appointed for a definite term of years, or are those persons officers?

MR. YOUNG: Yes, Delegate Davis, I think they are officers; and when I came up here I knew this amendment was coming, and I was looking for Delegate Knuppel when he asked the other day whether there were any minority reports or division on the Committee on the Executive. I fought, bled, and died for an amendment just like this in our committee and was beaten, I think, ten to one or ten to two; and the reason for that is really the same question that Delegate Davis just presented.

It was pointed out to me that if such a provision

contained—or was similar to Delegate Netsch's proposal, that we would be giving the governor the power to discharge the members he appointed for a specific term, such as the Illinois Commerce Commission, where they are appointed for a four-year period, and some of the other boards throughout the state—the University boards—and it is my understanding also that even the heads of the Code Departments are really appointed for a two-year period.

So I was defeated in committee on this language for those reasons—that they felt that this language should be retained to give some protection to the board members that are appointed by the governor. I believe that a member of the Illinois Commerce Commission was removed not long ago. The governor—I forget what his reason was, but it was one of these three, and there was no contest over it; the man quit. Did I answer your question?" (3 Proceedings 1325.)

## Delegate Netsch added:

"MRS. NETSCH: Mr. President, could I also respond to Mr. Davis's question? I think in general I would agree with the answer that Mr. Young gave, that it would make it possible for the governor to remove a member of a board or commission who was appointed for a definite term. I would only add to that, that precisely the same is true under the existing constitutional provision. The only difference at all is that he now must use one of these three magic words in making the removal." (3 Proceedings 1325.)

## Delegate Davis, voicing his opposition, stated:

"MR. DAVIS: Mr. President, I asked some questions. I didn't state my position, however. I am very much opposed to the Netsch amendment because it seems to me, from what I have seen in the past, that there have been governors who would move in and dismiss an entire board or commission, even though it was appointed with staggered terms for the purpose of providing expertise and experience on the board—come in and replace it with his own appointees—and I think that is undesirable. I think that the language which is in here, while it does give the governor the leeway to discharge a person if he wants to bear the onus of stating that they have misbehaved in

office—nevertheless, this is a deterrent to wholesale dismissals of officers of the state who should be retained throughout their terms." (3 Proceedings 1326-27.)

And Delegate Young added:

"MR. YOUNG: I think, Mr. President, that Delegate Davis stated our position very well; and I just wanted to add that on many of these commissions—as a matter of fact, I would guess most of them—that there are always minority members, and the governor might move in and remove the members of the minority party and put some members on that were a little more friendly to him." (3 Proceedings 1327.)

In concluding the discussion on the amendment Delegate Netsch stated:

"MRS. NETSCH: May I comment just briefly on the questions that have been raised, Mr. President? The concern about whether or not the language is sufficient to permit the governor—and this is true, incidentally, in both the committee's proposal and my own—to permit one governor to remove an appointee of a predecessor governor—I have no problem with that as it is written in either the majority report or my proposed amendment, because it does not say the governor may remove any officer he appointed. It says that he may remove any officer whom he may appoint—and it clearly is that office which is referred to, not the individual holder thereof.

I agree with Delegate Young—I think there is no question that this would be read to apply to the governor's filling of a vacancy in the office of lieutenant governor or secretary of state, or whatever. Those are not offices which he has the right to appoint. He may only fill a vacancy when it occurs pursuant to the particular constitutional provision.

And finally, if I may respond again to the point that Mr. Davis has raised—again I would simply suggest that the governor is, under the present constitution, perfectly free to remove any members of any boards or commissions or whatever that he chooses to adjust membership of. If a governor were really determined to go in and make a wholesale change in membership of a board—the example that Delegate Davis was suggesting—I think he would be in no way deterred from doing that by the present constitutional language, because his judgment—his

naming of one of these grounds of removal—is absolutely unchallengeable in the courts, and that is a clear-cut holding by the Illinois Supreme Court.

On the other hand, the present language—the committee's language—does present, I think, a very major deterrent to a governor who is faced with the kind of dilemma that Delegate Butler referred to, where there is a major policy or personality difference between the governor and one of his own major executive agency heads. He is either compelled to live with the man or to charge him with some fairly serious charges. And that, it seems to me, is an unconscionable dilemma to face the governor with." 3 Proceedings 1327.

It is apparent that the delegates preferred to retain the "magic words" of the 1870 Constitution for such deterrent value to the wholesale removal of appointees as they might have. It is equally apparent, to me, that they did not intend them to have any greater significance than *Wilcox* had held them to have. And there is no indication of an intent that the exercise by the Governor of his removal power should be judicially reviewable.

An adequate answer to the argument that the removal power, if not limited, may be abused was given in *People ex rel. Millner v. Russel* (1924), 311 Ill. 96, 100, for, to paraphrase the language there used, the bare possibility that public officials may abuse powers plainly vested in them affords no basis for courts to hold the power never existed. And, I would add that Illinois history during the 98 years since *Wilcox* does not reveal, so far as I am aware, any serious abuse of the removal power.

My disagreement with the court as to the restrictions upon the Governor's power requires that I consider the additional arguments of the parties.

Plaintiff and *amici* vigorously contend that it was the intent of the General Assembly to create, in the State Board of Elections, an agency which, while in the executive branch of government, was exempt from the Governor's removal authority, the members of the Board being removable during their terms only by impeachment.

It is unnecessary, however, to consider whether it is within the power of the General Assembly to vest the power of appointment of Board members in the Governor without subjecting them to the removal power. For the purposes of this case it is sufficient to say that no such intent is manifest in the act before us. Its provisions do not differ, in principle, from many other legislative enactments wherein the appointive power to be exercised by the Governor is restricted, albeit not so narrowly as here. See, *e. g.,* Ill. Rev. Stat. 1973, ch. 122, pars. 1A—1, 1A—2.

Plaintiff and *amici* urge, as additional authority for their position that the Governor has no removal power, the provision found in both the 1970 Constitution (Ill. Const., art. III, sec. 5) and the statute (Ill. Rev. Stat. 1973, ch. 46, par. 1A—4) that no political party shall have a majority of the members of the Board. That provision, in my judgment, was designed to insure that the method of creating the Board of Elections, whatever that method might be, would, insofar as the General Assembly action was concerned, involve an even political balance. It is obvious, of course, that this balance may be temporarily disturbed by the death, resignation, incapacity or removal of an incumbent. But it seems clear to me that the drafters of the Constitution did not intend that the Board should be immobilized by these events. Rather, the inference to be drawn from the constitutional debates as to the Governor's removal power as it affects the Board of Elections is that the power was not restricted in this respect to any greater extent than it is as to other gubernatorial appointees. And the implementing statutes expressly recognize that a vacancy on the Board is created by removal of a member from office. Sec. 1A—14; Ill. Rev. Stat. 1973, ch. 46, par. 25—2.

While it is, in my judgment, clear that the Governor has the power to remove plaintiff from the State Board of Elections, the question remains whether that power may be summarily exercised or whether the due process

guarantees of the fourteenth amendment of the Federal Constitution and section 2 of article I of the 1970 Constitution require notice, a hearing and an opportunity for judicial review prior to removal. "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount." (*Board of Regents of State Colleges v. Roth* (1972), 408 U.S. 564, 569-70, 33 L. Ed. 2d 548, 556, 92 S. Ct. 2701, 2705.) The Supreme Court has now rejected any distinctions between "rights" and "privileges" as a means of determining the applicability of procedural due process and has made clear that "property" interests extend beyond the ownership of real estate, chattels or money and that "liberty" encompasses more than just the formal constraints of the criminal process. "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries. For the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning." 408 U.S. 564, 572, 33 L. Ed. 2d 548, 558, 92 S. Ct. 2701, 2706.

The recognition of "property" interest, broadened considerably by recent Supreme Court decisions (see, *e.g., Goss v. Lopez* (1975), 419 U.S. 565, 42 L. Ed. 2d 725, 95 S. Ct. 729 (public education); *Fuentes v. Shevin* (1972), 407 U.S. 67, 32 L. Ed. 2d 556, 92 S. Ct. 1983 (interest in chattel under conditional sales contract); *Bell v. Burson* (1971), 402 U.S. 535, 29 L. Ed. 2d 90, 91 S. Ct. 1586 (driver's license); *Goldberg v. Kelly* (1970), 397 U.S. 254, 25 L. Ed. 2d 287, 90 S. Ct. 1011 (welfare benefits)), has been extended into the area of public employment (see *Arnett v. Kennedy* (1974), 416 U.S. 134, 40 L. Ed. 2d 15, 94 S. Ct. 1633; *Board of Regents of State Colleges v. Roth* (1972), 408 U.S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701; *Perry v. Sindermann* (1972), 408 U.S. 593, 33 L. Ed. 2d

570, 92 S. Ct. 2694; *Connell v. Higginbotham* (1971), 403 U.S. 207, 29 L. Ed. 2d 418, 91 S. Ct. 1772; *Slochower v. Board of Higher Education* (1956), 350 U.S. 551, 100 L. Ed. 692, 76 S. Ct. 637; *Wieman v. Updegraff* (1952), 344 U.S. 183, 97 L. Ed. 216, 73 S. Ct. 215), but in doing so the court has made abundantly clear that property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as *state law*—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." (Emphasis added.) *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 33 L. Ed. 2d 548, 561, 92 S. Ct. 2701, 2709.

While this court long ago recognized the right to work as a property right (*Levin v. Civil Service Com.* (1972), 52 Ill. 2d 516, 521, and cases there cited), it also held that, generally speaking, there was no property right in public employment (*Levin* and cases there cited), although public employees may, under certain circumstances, have rights to continued employment recognized for due process purposes as "property" rights. (*Powell v. Jones* (1973), 56 Ill. 2d 70, 77.) It should be noted, however, that there are substantial differences between the plaintiffs in *Powell,* who were full-time employees certified under this State's civil service system, the plaintiffs in *Roth* and *Perry,* who were full-time university professors, and the plaintiff here, whose duties as a member of the State Board of Elections were of a part-time nature and whose principal occupation in the practice of law will remain comparatively unaffected by his removal. Also of some significance in determining the applicability of due process protections in this context is the traditional concept of this type of part-time governmental service as of a less than permanent duration with frequent personnel changes as terms expire, if not more often.

The Supreme Court opinions also speak of "liberty" as distinguished from "property," and it is apparent that

plaintiff's liberty could be unconstitutionally infringed if the Governor, in removing plaintiff, made a "charge against him that might seriously damage his standing and associations in his community" (*Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 573, 33 L. Ed. 2d 548, 558, 92 S. Ct. 2701, 2707), since "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." (*Wisconsin v. Constantineau* (1971), 400 U.S. 433, 437, 27 L. Ed. 2d 515, 519, 91 S. Ct. 507, 510.) Similarly, plaintiff's liberty would be affected if the Governor had imposed on plaintiff "a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." (*Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 573, 33 L. Ed. 2d 548, 559, 92 S. Ct. 2701, 2707.) An analysis of the cases cited by the Supreme Court in *Roth* (see *Wisconsin v. Constantineau, Wieman v. Updegraff, Joint-Anti-Fascist Refugee Committee v. McGrath* (1951), 341 U.S. 123, 95 L. Ed. 817, 71 S. Ct. 624; *United States v. Lovett* (1946), 328 U.S. 303, 90 L. Ed. 1252, 66 S. Ct. 1073; *Peters v. Hobby* (1955), 349 U.S. 331, 99 L. Ed. 1129, 75 S. Ct. 790; *Cafeteria and Restaurant Workers Union, Local 473 v. McElroy* (1961), 367 U.S. 886, 6 L. Ed. 2d 1230, 81 S. Ct. 1743; *Truax v. Raich* (1915), 239 U.S. 33, 60 L. Ed. 131, 36 S. Ct. 7; *Schware v. Board of Bar Examiners* (1957), 353 U.S. 232, 1 L. Ed. 2d 796, 77 S. Ct. 752) leads me to conclude that the nature and consequences of the Governor's action are not such as to impermissibly interfere with plaintiff's liberty. An almost identical issue was considered by the Seventh Circuit Court of Appeals in *Adams v. Walker* (7th Cir. 1974), 492 F.2d 1003, 1004, in which the Governor had removed a member of the Illinois Liquor Control Commission for "incompetence, neglect of duty and malfeasance in office and other cause pursuant to the constitutional and statutory powers vested in me as

Governor." After considering *Roth* and the cases there cited, the court concluded that the charge against Adams was "of a different order of magnitude than charges of dishonesty, immorality, disloyalty, Communism, subversive activities, alcoholism or narcotics violations" (492 F.2d 1003, 1008-09), finding that, "given the Governor's absolute discretion to dismiss his appointees, coupled with the requirement that he invoke the constitutional language, his statement means nothing more than if he had said, 'I am dismissing you because I think I can find a better liquor commissioner.' " (492 F.2d 1003, 1007-08.) Similarly, here the Governor's statement that plaintiff was being removed for "neglect of duty" in not filing a financial disclosure statement really means nothing more than that plaintiff and the Governor disagree as to whether members of the Board of Elections should be required to file financial disclosure statements. While it is, of course, possible that some persons might draw unfavorable inferences from plaintiff's alleged refusal to file a financial disclosure statement, plaintiff was surely aware of that possibility when he accepted appointment as a member of the Board and then raised the issue concerning financial disclosure; moreover, such unfavorable implications would arise, if at all, when plaintiff questioned the necessity of filing, and would exist even if plaintiff had not been removed by the Governor. In my judgment, the "use of the talismanic phrase '*** neglect of duty ***' in effecting [his] discharge was plainly to satisfy the state constitutional provision and did not take liberty without due process of law." 492 F.2d 1003, 1007.

After a full consideration of the numerous recent Supreme Court decisions involving similar procedural due process issues, my understanding of the meaning of "liberty" and "property" persuades me that no "liberty" or "property" interest of plaintiff was affected by the Governor's action. As earlier noted, the framers of the 1970 Constitution intended to continue the summary

power of the Governor, established by *Wilcox,* to remove any officer he appoints, a clear indication that no protected "property" or "liberty" interest was intended in any position to be filled by gubernatorial appointment. The legislature, aware of the Governor's broad removal power and authorized by the Constitution to establish other means of selecting the members of the Board, nevertheless determined that Board members were to be appointed by the Governor. I accordingly conclude that the summary removal power exists unrestricted by due process requirements.

I would vacate the temporary injunction and remand the cause with directions to dismiss the complaint.

MR. JUSTICE SCHAEFER joins in this dissent.