Nancy FORD, Plaintiff,

v.

Rod R. BLAGOJEVICH, Defendant.

No. 03–3089.

United States District Court,
C.D. Illinois,
Springfield Division.

May 8, 2003.

Carl R Draper, Feldman Wasser Draper & Benson, Springfield, IL, for plaintiff.

Michael L Brody, Winston & Strawn, Chicago, IL, Carol J Hansen Posegate, Posegate & Denes PC, Springfield, IL, for defendant.

### ORDER

SCOTT, District Judge.

Diane Ford (Ford) filed this lawsuit against Illinois Governor Rod R. Blagojevich over his action in firing her from the Illinois Industrial Commission. She claims that when he fired her from her position as a Commissioner of the Illinois Industrial Commission, he deprived her of her constitutional right to property in that job without due process of law because he fired her without prior notice to her and an opportunity for her to respond to the charges at a hearing. She also claims that Governor Blagojevich violated her constitutional right to liberty because when he fired her, he issued a press release which injured her reputation and good name. She seeks monetary damages against Governor Blagojevich personally and also seeks declaratory and injunctive relief against him in his official capacity.

Ford also filed a Motion for Preliminary Injunction based on the alleged denial of her property interest in the job as Commissioner. She asks the Court to enjoin Governor Blagojevich, in his official capacity, from removing her as a member of the Illinois Industrial Commission and from replacing her on that Commission.

The Court held an evidentiary hearing on April 28, 2003, on the Motion for Preliminary Injunction. Based on the evidence presented at the hearing, the Court now denies the Motion for Preliminary Injunction. Ford was never properly appointed to the Illinois Industrial Commission because former Governor George Ryan attempted to fill one vacancy on the Commission by naming two people to it in a fashion contrary to Illinois law. Since Ford has not demonstrated a likelihood of proving that she was lawfully appointed a Commissioner in the first instance, then she does not have a property interest in the job to which the constitutional protections apply. Accordingly, her claim for preliminary injunctive relief fails.

### FACTS

In 2002, Ford served as chief legal counsel to former Illinois Governor George Ryan. She testified that Governor Ryan filed paperwork in August 2002, appointing her a Commissioner of the Illinois Industrial Commission.[1] She stated that the Illinois General Assembly was not then in session; she was later confirmed by the Illinois Senate in December 2002, for a term starting January 1, 2003. She indicated that hers was an interim appoint-

---

**1.** The paperwork bears the date July 3, 2002. *See Def. Exh. 3.*

ment, to fill a vacancy in someone else's term, which could last until January 2005.

The Commission consists of seven members appointed by the Governor, with the consent of the Illinois Senate. 820 ILCS § 305/13. Two members must be representative of the employing class; two members must be representative of the employee class; and three members must be citizens not identifiable with either class. *Id.* No more than four members of the Commission may be of the same political party. *Id.*[2] Ford was to serve as a public member—not identifiable with either the employing class or the employee class.

Ford began performing duties as a Commissioner on January 1, 2003. As a Commissioner Ford participated in panels which heard appeals of arbitrator's decisions of worker's compensation claims. Each of two panels hears approximately 500 cases a year. Ford prepared opinions in one-third of the cases heard by her panel. *Transcript of hearing*, p. 15 (Trans.). Ford also was responsible for conducting review calls in Mt. Vernon and Collinsville, in her territorial assignment covering Southern Illinois. Ford, like all other Commissioners, also conducted review calls in Chicago. A review call is one in which an individual would come before a Commissioner and seek to enforce either a settlement contract or an order that had not been enforced, or ask for penalties or attorney fees. Ford testified that some issues at a review call may be decided by an individual Commissioner; others are decided by the full Commission. Ford stated that she also had monthly review calls in Chicago, hearing approximately 25 cases per review call. She had quarterly review calls in Collinsville and Mt. Vernon

where she heard approximately 35 cases per quarter. *Trans.* pp 10–12.

On April 14, 2003, Ford received a phone call from Dennis Ruth, Chairman of the Commission, who told her he had a letter from Governor Blagojevich firing her. He then read the letter to her; she received the letter on April 15, 2003. The letter stated: "I am writing to notify you that, effective immediately, I am removing you from the Industrial Commission for incompetence, neglect of duty or malfeasance in office, pursuant to the constitutional powers vested in me as Governor of the State of Illinois." *Pl. Exh. A.* Ford testified that she received no other direct communication from Governor Blagojevich concerning her removal. Ford stated that she received no evidence of the basis for her removal and no hearing or opportunity to respond to any charges prior to being removed from office. The only other information she received about her removal came from a press release she saw posted on the state website which was dated April 14, 2003, and headlined, "Blagojevich fires Ryan administration official for scheming to lock top-level state employees into jobs." *Pl.Ex. B.* The press release referred to Ford's alleged role in certain other employment transactions of others that are described below.

Since her termination on April 14, 2003, Ford has not had access to her office to perform the duties of a Commissioner. She has been unable to complete opinions which she had been assigned to draft. She has been unable to review opinions circulated by members of the panel on which she sat. *Trans.* p. 14–15, 51.

The defense called Chairman Ruth to testify. He has general supervisory authority over all day-to-day affairs of the

---

**2.** Both the Statute and the parties also refer to members of the Commission as "Commis- sioners."

Commission, which include arbitration, personnel, assignment of cases, and any type of administrative matters involving the affairs of the Commission. *Trans.* p. 30. He is also one of the public members of the Commission, not representing either the employer class or the employee class. *Trans.* p 31. Ruth testified that he was called to the Governor's office on April 14, 2003, and told that the Governor was removing Ford as a Commissioner; Ruth was told to deliver the letter to that effect to Ford. *Trans.* p. 34. He stated that he immediately faxed the letter to her home and then called her and read the letter to her. *Trans.* p. 35–36. She indicated to him that she would sue the Governor.

Thereafter, Ruth reviewed Ford's appointment papers and those of two others (Paul Rink and Robert Madigan) who preceded Ford in that seat on the Commission. He learned the following:

On June 27, 2001, Governor Ryan appointed Robert Madigan as a Commissioner. Madigan filled the position formerly held by Mike Weaver. The letter of nomination Governor Ryan sent to Secretary of State Jesse White, with the subject "Temporary Appointment of Robert A. Madigan as a member to the Industrial Commission" stated:

Effective July 2, 2001, and upon filing the Oath of Office with the Secretary of State, I have made the temporary appointment of the following person as a member, who shall execute the powers and discharge the duties vested by law in the Industrial Commission until the permanent appointment can be made:

| NAME | SALARY | EXPIRATION DATE | POSITION FORMERLY HELD BY |
|---|---|---|---|
| Robert A. Madigan Lincoln, IL 62656 | $101,790.00 | 1/17/2005 | Mike Weaver |

Subject to confirmation, upon receipt of the Oath of Office, please issue the Commission.

*Def. Ex. 1,* p. 2. Madigan signed the oath of office on June 25, 2001. On November 7, 2001, Madigan's nomination was transmitted to the Senate, and on November 14, 2001, his nomination was confirmed by the Senate.

On July 3, 2002, Governor Ryan nominated Paul Rink as a Commissioner. Governor Ryan sent a letter to Illinois Secretary of State Jesse White, also dated July 3, 2002, with the subject: "Temporary Appointment of Paul W. Rink as a member to the Industrial Commission." *Def. Ex. 2,* p. 2. The letter stated the following:

Effective July 8, 2002, and upon filing the Oath of Office with the Secretary of State, I have made the temporary appointment of the following person as a member, who shall execute the powers and discharge the duties vested by law in the Industrial Commission until the permanent appointment can be made:

| NAME | SALARY | EXPIRATION DATE | POSITION FORMERLY HELD BY |
|---|---|---|---|
| Paul W. Rink Chicago, IL 60605 | $101,790.00 | 12/31/2002 | Robert Madigan |

Subject to confirmation, upon receipt of the Oath of Office, please issue the Commission.

*Id.*[3] Rink signed the Oath of Office on July 3, 2002. His nomination was transmitted to the Senate on November 21, 2002, and he was confirmed by the Senate on December 4, 2002, for the term stated in Governor Ryan's letter.

Also on July 3, 2002, Governor Ryan nominated Ford as a Commissioner. He

---

**3.** There is no evidence in the record indicating how or why Madigan's position became vacant. Both parties argue in their briefs that Madigan resigned from the position; Ford also argues that he resigned during a recess in the Illinois Senate.

sent a letter to Secretary of State White, with the subject: "Appointment of Diane Ford as a member to the Industrial Commission." *Def. Ex. 3,* p. 2. That letter was also dated July 3, 2002. The letter stated the following:

Effective January 1, 2003, and upon filing the Oath of Office with the Secretary of State, I have made the appointment of the following person as a member, who shall execute the powers and discharge the duties vested by law in the Industrial Commission:

| NAME | SALARY | EXPIRATION DATE | POSITION FORMERLY HELD BY |
|---|---|---|---|
| Diane Ford | $101,790.00 | 1/17/2005 | Paul Rink |
| New Berlin, IL 62670 | | | |

Subject to confirmation, upon receipt of the Oath of Office, please issue the Commission.

*Id.* Ford signed the Oath of Office on April 15, 2002 (two and one-half months before Governor Ryan nominated her). Like Rink's nomination, Ford's was also transmitted to the Senate on November 21, 2002, and she was confirmed by the Senate on December 4, 2002, for the term stated in Governor Ryan's letter. The Senate's record of confirmation lists Rink's appointment before Ford's. *See Def. Exh. 4.*

Ruth also testified that there are procedures for dealing with pending cases when a Commissioner leaves office. *Trans.* p. 56. He stated that he was unaware of any circumstance in the history of the Commission where a temporary Commissioner was subject to Senate approval. *Trans.* p. 58. He likewise was unaware of any other instance in which two people were appointed to the same Commissioner position on the same date. *Id.* He further testified that Paul Rink never resigned his position on the Commission. *Trans.* p. 42.

The defense then called Thomas Londrigan to testify. Londrigan is Governor Blagojevich's chief legal counsel for Springfield. Londrigan testified that in February 2003, he began to investigate over forty employment transactions regarding state employees who resigned from term appointment positions in the late summer of 2002, but were then reappointed to the same position. *Trans.* p. 69.

Londrigan's testimony was received for the purpose of showing the process used and the information the Governor had on which he based his decision to remove Ford from the Commission. Londrigan began his investigation by speaking with Central Management Services (CMS), the state agency that processed these personnel transactions. *Id.* p. 71. Londrigan then spoke with the personnel directors or chiefs of staff of the thirteen agencies involved in these employment transactions. *Id.* p. 72. Londrigan spoke with sixteen people and reviewed 42 or 43 personnel files of the employees involved in these transactions. *Id.* p. 73. During his investigation, Londrigan learned that Ford and others in Governor Ryan's office played a role in arranging these appointments. *Id.* p. 74–83. Upon completing his investigation, Londrigan composed a Memorandum detailing the results of his investigation. *Id.* p. 84. The Memorandum was dated April 7, 2003, and addressed to Civil Service Commissioners. *Id.* Londrigan also forwarded a copy of the Memorandum to Governor Blagojevich's office. *Id.*

In his memorandum, Londrigan advised Governor Blagojevich that all forty employees engaged in four transactions. First, they resigned from their term appointments. Second, the next day, they were appointed to other jobs. Then, four days later, they resigned from the new job and finally were again appointed to their old jobs—with new four year terms. *Def. Exh. 6.* Londrigan informed Governor Blagojevich that the employees never reported to, or did any work at, the second jobs to which they were appointed. *Id.* Londri-

gan wrote that Ford played a key role in "concocting and implementing this scheme"; he noted that Ford even called the Director of the Department of Corrections and threatened to fire him when he initially refused to execute the term extensions. *Id.* Londrigan's report, dated April 7, 2003, was forwarded to Governor Blagojevich. *Trans.* p. 83. One week later, Governor Blagojevich sent the letter, described above, firing Ford from her position as a Commissioner for the Commission and issued a press release indicating he had fired Ford for devising and executing a scheme to abuse the state's personnel system by locking friends and allies of Governor Ryan into long-term, high paying jobs. *Pl. Exh. B.*

## ANALYSIS

In order to obtain a preliminary injunction, Ford must demonstrate: (1) some likelihood of prevailing on the merits of the underlying case, and (2) an inadequate remedy at law and irreparable harm if preliminary relief is denied. If she clears these two thresholds, the Court must consider (3) the irreparable harm Governor Blagojevich will suffer if preliminary relief is granted, balanced against the irreparable harm to Ford if relief is denied; and (4) the public interest, meaning the effect that granting or denying the injunction will have on nonparties. *Grossbaum v. Indianapolis–Marion County Bldg. Auth.,* 63 F.3d 581, 585 (7th Cir.1995) (*quoting Erickson v. Trinity Theatre, Inc.,* 13 F.3d 1061, 1067 (7th Cir.1994)).

 To succeed on the merits for a claim of deprivation of property without due process of law, Ford must show that she had a property interest in her position on the Commission and that she was deprived of that interest without being afforded due process of law. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Listenbee v. City of Milwaukee,* 976 F.2d 348, 351 (7th Cir.1992). Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law...." *Loudermill,* 470 U.S. at 538, 105 S.Ct. 1487 (*quoting Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). In Illinois, "[a] person has a property interest in [her] job where [she] has a legitimate expectation of continued employment ... based on a legitimate claim of entitlement." *Draghi v. County of Cook,* 184 F.3d 689, 692 (7th Cir.1999)(*quoting Faustrum v. Board of Fire & Police Comm'rs.,* 240 Ill.App.3d 947, 181 Ill.Dec. 567, 608 N.E.2d 640, 641 (1993)).

Ford's claim of a property interest in the position of a Commissioner, therefore, must be examined in the context of the Illinois law defining the Commission and the procedure set forth in the statute for filing vacancies on it, as well as the Illinois constitutional provision defining the Governor's powers. The Commission was created by the Illinois legislature to administer the Illinois Worker's Compensation Act. 820 ILCS § 305/13. By statute, a Commissioner is appointed for a term of four years, running from the third Monday in January of the year of his appointment and until a successor is appointed and qualified. 820 ILCS § 305/13. All appointments must be made so that the composition of the Commission is in accordance with the requirements in paragraph one of the section, which establishes the size of the Commission (seven members), the employer/employee class requirements (two members representing each class and three public members), as well as the political party limitations (no more than four members of the same party). *Id.* If a vacancy on the Commission occurs while the Senate is in recess,

the Governor shall make a temporary appointment until the next meeting of the Senate, when he shall nominate

some person to fill such office. Any person so nominated who is confirmed by the Senate shall hold office during the remainder of the term and until his successor is appointed and qualified.

*Id.*

Under the Illinois Constitution, the Governor is authorized to nominate, by and with the advice and consent of the Senate "... all officers whose election or appointment is not otherwise provided for. Any nomination not acted upon by the Senate within 60 session days after the receipt thereof shall be deemed to have received the advice and consent of the Senate." *1970 Illinois Constitution,* Article V, § 9(a). The Constitution further provides: "(b) If, during a recess of the Senate, there is a vacancy in an office filled by appointment by the Governor by and with the advice and consent of the Senate, the Governor shall make a temporary appointment until the next meeting of the Senate, when he shall make a nomination to fill such office." *1970 Illinois Constitution,* Article V, § 9(b). Finally, the Constitution provides: "The Governor may remove for incompetence, neglect of duty, or malfeasance in office any officer who may be appointed by the Governor." *1970 Illinois Constitution,* Article V, § 10.

A similar provision concerning the Governor's removal power was found in the 1870 Illinois Constitution. The Illinois Supreme Court construed that provision in the 1870 Illinois Constitution, as making the Governor's removal power co-extensive with his power of appointment. *Wilcox v. People ex rel. Lipe,* 90 Ill. 186 (1878). The *Wilcox* analysis was followed by the Seventh Circuit in construing the removal power of the Governor under the 1970 Illinois Constitution. The Seventh Circuit quoted *Wilcox* as stating that once the

Governor determined that he had a basis to remove someone for incompetence, neglect of duty, or malfeasance, separation of powers prohibited the courts from questioning the Governor's determination of cause. *Adams v. Walker,* 492 F.2d 1003 (7th Cir.1974). The court in *Adams* held that Adams could be removed from his six year term on the Illinois Liquor Control Commission whenever the Governor saw fit to recite the magic words, "incompetence, neglect of duty, or malfeasance in office." *Id.* at 1009.[4] The court held that *Adams* had no property right in the position. *Id.* at 1007.

Two years later, however, the Illinois Supreme Court addressed the removal power provision in the 1970 Illinois Constitution. The Illinois Supreme Court construed the language in light of the delegates' debates at the 1970 Constitutional Convention and found that the framers did not intend for the Governor to be able to remove members of the Illinois State Board of Elections without cause simply by reciting the magic words "incompetence, neglect of duty, or malfeasance in office." *Lunding v. Walker,* 65 Ill.2d 516, 3 Ill.Dec. 686, 359 N.E.2d 96 (1976). The court found in the Convention debates an intent on the part of the delegates to change then existing law, as stated in *Wilcox,* and an intent that the Governor's removal power not be absolute in all cases. *Id.* at 526, 3 Ill.Dec. 686, 359 N.E.2d 96. The court in *Lunding* analogized from certain federal cases which had addressed the President's powers and determined that like the President, the Governor as the State's executive, should have greater discretion to remove an official who was part of the Executive establishment than an official who was a part of a body called upon to exercise its judgment without in-

---

4. There is no majority opinion in *Adams v. Walker,* 492 F.2d 1003 (7th Cir.1974). Judge Cummings and Judge Stevens concurred in the result, but each wrote separately. The principle cited here is from Judge Stevens' opinion.

terference from any other official or department of government. *Id.* at 522–525, 3 Ill.Dec. 686, 359 N.E.2d 96. The court concluded that since the State Board of Elections was constitutionally mandated and politically independent, the Governor could only remove its members for cause and that the decision of what constituted cause was judicially reviewable. *Id.* at 527–528, 3 Ill.Dec. 686, 359 N.E.2d 96. The court further limited its holding to "this particular factual setting." *Id.* at 529, 3 Ill.Dec. 686, 359 N.E.2d 96.

 Ford argues that the members of the Commission are entitled to the same protection from removal by whim of the Governor as the members of the State Board of Elections. Governor Blagojevich notes that, unlike the State Board of Elections, the Commission is not constitutionally mandated, and the Governor should have greater discretion in removing its members. Although the Commission is not constitutionally mandated, the legislative act establishing it indicates a desire to have a neutral, bi-partisan, and independent board administer the Worker's Compensation Act. This body is charged with the function of reviewing decisions by arbitrators in worker's compensation cases. In those cases, the Commission's functions are "to assess the credibility of witnesses, resolve conflicts in the evidence, weigh the evidence, draw reasonable inferences from the evidence, and determine the questions of fact." *Meadows v. Industrial Com'n,* 262 Ill.App.3d 650, 199 Ill.Dec. 937, 634 N.E.2d 1291 (5th Dist.1994), citing *Paganelis v. Industrial Com'n,* 132 Ill.2d 468, 139 Ill.Dec. 477, 548 N.E.2d 1033 (1989). The Commission has a balance of membership politically and with respect to employee-employer-public representation. The legislative action in providing for such neutral bipartisan membership on the Commission, coupled with the awarding of specific terms to its members, leads this Court to conclude that there are the same strong considerations for political independence for this Commission that there are for the State Board of Elections. Since political independence was the primary factor the court relied upon in its decision in *Lunding* and since political independence also is required of the Illinois Industrial Commission, this Court likewise holds that the lawfully appointed members of the Commission can only be removed for cause, and a Governor's decision removing members is subject to judicial review.

Consistent with that finding, the Court also finds, by implication, that those lawfully appointed as commissioners have a constitutionally protected property interest in the position. There would be no logic in requiring *cause* to remove a person from a position if there were no property interest in the position held by the officer holder.

 The critical question in this phase of the case, thus, is whether Ford has demonstrated a reasonable likelihood of success in proving that she was a lawfully appointed member of the Commission at the time Governor Blagojevich removed her. If so, then she has a constitutionally protected property interest and is entitled to due process under the Fifth and Fourteenth Amendments to the United States Constitution before she can be removed. In that event, she has succeeded in showing that she did not receive the constitutionally required notice and opportunity to respond before being fired, and the Court will move on to consider whether she has demonstrated irreparable harm and an inadequate remedy at law if a preliminary injunction is not entered.[5] On the other

---

**5.** Although Governor Blagojevich has argued that the investigation he had attorney Londrigan conduct and the findings forwarded to him by attorney Londrigan constituted due process and demonstrated that he had actual cause to fire Ford and did not act on a whim,

hand, if Ford has not demonstrated that she was a lawfully appointed member of the Commission at the time Governor Blagojevich fired her, then she had no property interest to which the constitutional protections attached.

Under the Illinois Worker's Compensation Act, a member of the Commission is appointed to a term of office of four years, running from the third Monday of January of the year of the appointment and until his successor is appointed and qualified. 820 ILCS 305/13. The Act provides that:

> In case of a vacancy in the office of a Commissioner during the recess of the Senate, the Governor shall make a temporary appointment until the next meeting of the Senate, when he shall nominate some person to fill such office. Any person so nominated who is confirmed by the Senate shall hold office during the remainder of the term and until his successor is appointed and qualified.

*Id.* This language conforms with Article V, § 9(b) of the 1970 Illinois Constitution. A plain reading of these two portions of Section 13 and Article V, § 9(b) of the Illinois Constitution indicates that a temporary appointment exists only while the Senate is in recess. Once the Senate is in session and confirms the Governor's appointment, the appointment is no longer temporary, but is for the remainder of the four year term and until the appointee's successor is appointed and qualified.

On July 3, 2002, then-Governor Ryan appointed Rink to fill the vacancy on the Commission caused by Madigan's apparent resignation. Governor Ryan stated in the letter to Secretary of State Jesse White that he limited Rink's term of office to December 31, 2003, even though Madigan's term had run through January 17, 2005. Also on July 3, 2002, Governor Ryan appointed Ford to take Rink's position effective January 1, 2003. Ford's appointment was to last until January 17, 2005, which represented the balance of Madigan's term. The appointments of Rink and Ford were both "transmitted" to the Senate on November 21, 2002. Both were confirmed by the Illinois Senate on December 4, 2002, "to be a member of the Industrial Commission ..." *Def. Exh. 2 and 3.*

Under the language of Section 13, the Senate's confirmation of Rink's appointment to Madigan's former position meant that the vacancy on the Commission was filled. By statute, once Rink's confirmation was approved by the Senate, he took over the balance of Madigan's term, which does not expire until January 17, 2005. There is nothing in Section 13 which allows the Governor to set limits to the term of office of a Commissioner approved by the Senate. The Governor may make a temporary appointment, but upon the next meeting of the Senate, the Governor is to nominate someone to fill the office. Once that nomination is confirmed by the Senate, the term of office is set by statute. The Senate approved Rink's appointment to fill Madigan's vacant seat. Accordingly, Rink took over Madigan's term, which despite Governor Ryan's limitation on Rink's term of office, did not expire until December 17, 2005. Once Rink was confirmed by the Senate, Governor Ryan had no power to appoint another person to the position until a vacancy occurred.

---

that is not enough to satisfy federal due process considerations. Once a person has a property interest in the job, the person is entitled to notice and an opportunity to respond to any charges before being fired.

*Loudermill,* 470 U.S. at 542–546, 105 S.Ct. 1487. It is uncontested that Ford did not receive notice and an opportunity to respond before she was fired.

Governor Ryan, however, attempted to limit Rink's term, and to appoint Ford in anticipation of a vacancy occurring in the future. According to Ford's appointment, she was to take over the position formerly held by Rink. However, Governor Ryan had no statutory authority to limit Rink's term of office once Rink's nomination was transmitted to the Senate and confirmed by the Senate. There is no evidence that Rink resigned; Ruth testified that Rink did not resign. Since Governor Ryan (1) did not have the statutory authority to limit Rink's term of office and (2) did not remove Rink once he was confirmed by the Senate, and since Rink did not resign, there was no "vacancy" on the Commission to be filled at the time Ryan designated Ford to serve on the Commission. "It is a condition precedent to power to fill a vacancy in office that such vacancy in fact exists ..." *Molnar v. City of Aurora,* 38 Ill.App.3d 580, 583, 348 N.E.2d 262, 265 (1976).

Ford argues, however, that the Court must glean Governor Ryan's intent from the language of the appointment letters and that his intent was to appoint Rink only until the Senate returned and that she was his appointee to fill the vacancy. She claims Rink's confirmation by the Senate was at most an error in procedure. The Court agrees that it should determine the Governor's intent from the appointment documents, read in conjunction with the statutes and constitutional provisions setting forth the Governor's powers. The Court, however, finds from those documents that Governor Ryan's intent was to apportion the remaining balance of Madigan's appointment to two appointees, giving the first six months to Rink and the balance to Ford.

In making that finding, the Court relies on the following:

(1) Governor Ryan sent two separate appointment letters—one each for Rink and Ford. If he had intended that Rink only receive the position temporarily, until the Senate returned to session, he would have only sent one letter indicating that Ford was to be Madigan's successor—he could have included mention that Rink was the temporary appointee, until the Senate returned, in that same letter.

(2) Governor Ryan specified an ending date to Rink's "term." A temporary appointee serves until the Senate returns and confirms the designated appointee. Since that date would be unknown to the Governor, he could not set an ending date for a temporary appointment. His designation of a specific ending date for Rink's appointment indicates an actual intent on Governor Ryan's part that Rink hold the position, other than as temporary appointee.

(3) Governor Ryan's actions in sending both nominations to the Senate simultaneously showed that he recognized Ford might be confirmed during the six months of Rink's appointment. If Rink were intended as a temporary appointee only, his term would end at the point of Ford's confirmation—in this case, on December 4, 2002. Clearly Governor Ryan intended for Rink to hold the position until January 1, 2003—beyond the date of Ford's confirmation.

(4) Governor Ryan designated Rink to fill the position formerly held by Robert Madigan and Ford to fill the position formerly held by Paul Rink. It is apparent that Governor Ryan intended for Rink to succeed Madigan and Ford to succeed Rink. That could only happen if Rink actually held the position before Ford, other than on a temporary basis. Otherwise, Ford would be listed as succeeding Madigan.

(5) The language used by Governor Ryan in making Paul Rink's "temporary" appointment was identical to that which he

used in appointing Robert Madigan. Madigan's appointment letter also had reference to the party he succeeded and to a beginning and ending date. His appointment letter, like Rink's, stated it was a temporary appointment. However, it was transmitted to the Senate; he, like Rink, was confirmed by the Illinois Senate. No one has argued that Madigan was only intended to be temporary appointee until the Senate returned to session. The same language used by Governor Ryan in making the Madigan appointment speaks to the Governor's intent in making Rink's appointment.

(6) Both the letter from Governor Ryan appointing Ford and the letter from Governor Ryan appointing Rink end with the sentence: "Subject to confirmation, upon receipt of the Oath of Office, please issue the Commission." This statement indicates Governor Ryan contemplated having each confirmed—which is unnecessary for a temporary appointee.

In sum, it appears clear that Governor Ryan intended for Rink to hold Madigan's unexpired term on the Commission for roughly six months and for Ford to hold the position for the balance of the unexpired term. Unfortunately for Ford, Illinois does not authorize the Governor to make the appointments in that manner. The first person confirmed holds office by law during the remaining unexpired term. 820 ILCS § 305/13.

The policy reasons Ford argues as a rationale why Governor Blagojevich could not fire her without cause are likewise applicable to demonstrate why Governor Ryan could not appoint her in the manner he attempted. If a Governor could truncate the term of appointment into small segments, review how an appointee rules before deciding to extend the appointment for the balance of the term, or appoint another part way through the stated term,

the goal of an independent board or commission would be unattainable.

In a similar situation, the Oklahoma Supreme Court held that its governor could not fill a position that was not vacant. *Abitbol v. Priore*, 797 P.2d 335 (Okla.1990). In *Abitbol*, the Oklahoma Governor appointed an acting district attorney, until a permanent one was "appointed and qualified or elected and qualified, whichever occurs earlier." *Id.* at 336. One month later the Governor appointed a second individual to fill the remainder of the unexpired term. *Id.* The Oklahoma Supreme Court noted that Oklahoma law clearly mandated that upon resignation of a district attorney, the Governor, " *'shall appoint a qualified person to serve the balance of the unexpired term'* of the office." *Id.* (*quoting* OKLA. STAT. tit. 19, § 215.9 (1987)) (emphasis in opinion). This provision echoed the general appointment power which provides that " *'[e]very appointed officer shall hold his office until the end of the term* for which the officer whom he succeeds was elected or appointed, *and until his successor is elected and qualified.'* " *Id.* (*quoting* OKLA. STAT. tit. 51, § 15 (1981)) (emphasis in opinion). Because of these statutory restrictions, the Oklahoma Court concluded that the governor's power to fill vacancies created by resignation, "does not include the authority to limit or condition the term during which the appointee is to serve." *Id.* at 337. Once the governor filled the vacancy, the position became *"irrevocably* filled by force of law *for the term's remainder."* *Id.* (emphasis in original). The Court concluded that the first named replacement was the appropriate district attorney.

The Oklahoma case did not involve confirmation of the appointment by a legislative body. However, once the appointment was finalized, the replacement district attorney's term was the balance

of the term of the original district attorney. Similarly, once Rink's appointment was finalized, i.e. confirmed by the Senate, his term of office was the balance of Madigan's term.

Section 13 does not allow the Governor to appoint more than one individual to a vacant position. There is no authority allowing him to do so absent any amendment of the Act by the General Assembly. The Senate's act in confirming an invalid appointment cannot validate an action which is in contravention of the statute. The process to change the statute is a legislative amendment, which the Senate could not enact on its own. The Illinois House would also have to concur in passing the amendment. Governor Ryan's effort to appoint two people simultaneously to the same position and apportion the unexpired term between them violated the statute. The fact that the Illinois Senate confirmed Rink and Ford for the durations listed in Governor Ryan's appointment letters does not transform Ford's invalid appointment into a valid one.

In conclusion, Rink's appointment to fill Madigan's position was confirmed by the Senate, which by statute meant Rink was to serve the balance of Madigan's term. Governor Ryan's limitation on the duration of Rink's term was invalid, and the evidence shows Rink has not resigned his position. Therefore, there was no vacancy for Ford to fill. Because there was no vacancy to fill, Ford's appointment to replace Rink violated Section 13. It follows that since Ford's appointment to the Commission was in violation of Illinois law, she does not have a valid entitlement to the position or a legitimate expectation of continued employment with the Commission. Since she has not shown such an expectation, Ford does not have a valid property interest in employment with the Commission. Accordingly, she has not shown a reasonable likelihood of success on her claim for deprivation of property without due process of law. Since she has not demonstrated a property interest, the Court does not need to analyze the remaining requirements for issuing a preliminary injunction.

THEREFORE, Plaintiff's Motion for a Preliminary Injunction (d/e 4) is DENIED.

IT IS THEREFORE SO ORDERED.