## Diane FORD, Plaintiff,

### v.

## Rod R. BLAGOJEVICH, Defendant.

### No. 03–3089.

United States District Court, C.D. Illinois, Springfield Division.

Sept. 15, 2003.

---

Carl R. Draper, Feldman Wasser Draper & Benson, Springfield, IL, for Plaintiff.

Michael L. Brody, Christina L. Collins, Winston & Strawn LLP, Chicago, IL, Carol Hansen Posegate, Posegate & Denes PC, Springfield, IL, for Defendant.

## ORDER

SCOTT, District Judge.

This case comes before the Court on Defendant Rod R. Blagojevich's (Governor Blagojevich) Motion for Summary Judgment. Plaintiff Diane Ford (Ford) filed this law suit under 42 U.S.C. § 1983 claiming that Governor Blagojevich violated her constitutional due process rights to property in her job as a Commissioner of the Illinois Industrial Commission and to her liberty interest in her office as a member of the Illinois Industrial Commission by the manner in which he removed her from the position. For the reasons stated below, Governor Blagojevich's motion is allowed.

| NAME | SALARY |
|---|---|
| Paul W. Rink<br>Chicago, IL 60605 | $101,790.00 |

Subject to confirmation, upon receipt of the Oath of Office, please issue the Commission.

On the same day, Governor Ryan sent a separate appointment letter to Secretary of State Jesse White stating:

Re: Appointment of Diane Ford as a member to the Industrial Commission

| NAME | SALARY |
|---|---|
| Diane Ford<br>New Berlin, IL 62670 | $101,790.00 |

Subject to confirmation, upon receipt of the Oath of Office, please issue the Commission.

On November 21, 2002, Secretary White transmitted both nominations to the Illinois Senate. The appointees were each

Ford served as chief legal counsel to former Illinois Governor George Ryan. On July 3, 2002, when the Illinois Senate was not in session, Governor Ryan sent a letter to Secretary of State Jesse White stating:

Re: Temporary Appointment of Paul W. Rink as a member to the Industrial Commission

Dear Secretary White:

Effective July 8, 2002, and upon filing the Oath of Office with the Secretary of State, I have made the temporary appointment of the following person as a member, who shall execute the powers and discharge the duties vested by law in the Industrial Commission until the permanent appointment can be made:

| EXPIRATION DATE | POSITION FORMERLY HELD BY |
|---|---|
| 12/31/2002 | Robert Madigan |

Dear Secretary White:

Effective January 1, 2003, and upon filing the Oath of Office with the Secretary of State, I have made the appointment of the following person as a member, who shall execute the powers and discharge the duties vested by law in the Industrial Commission:

| EXPIRATION DATE | POSITION FORMERLY HELD BY |
|---|---|
| 1/17/2005 | Paul Rink |

confirmed by the Illinois Senate on December 4, 2002. Rink (according to the appointment papers) was to replace former Commissioner Robert Madigan, who had previously resigned his position with a term due to expire January 17, 2005.[1]

---

1. On June 27, 2001, Governor Ryan sent Secretary of State White a letter stating:

Re: Temporary Appointment of Robert A. Madigan as a member to the Industrial Commission

Dear Secretary White:

Effective July 2, 2001, and upon filing the Oath of Office with the Secretary of State, I have made the temporary appointment of the following person as a member, who

Rink's term was to expire December 31, 2002. Ford was designated to take the position formerly held by Rink for a term to expire January 17, 2005. Rink neither resigned nor vacated his position prior to the time of either Ford's appointment by Governor Ryan or her confirmation.

After Governor Blagojevich took office in 2003, his chief legal counsel for Springfield conducted an investigation of a series of employment actions taken at the end of the prior administration which had extended the term of service for numerous state employees. Counsel interviewed sixteen employees and reviewed over forty personnel files. He did not interview Ford or give her any opportunity to respond to any allegations of wrongdoing. Counsel reported his findings to the Governor's office and concluded that a number of these appointments were shams and that Ford had orchestrated the transactions.

On April 14, 2003, Governor Blagojevich sent a letter to Ford removing her immediately from her position on the Illinois Industrial Commission on the grounds of "incompetence, neglect of duty or malfeasance in office." On the same day, Governor Blagojevich issued a press release stating:

> These individuals [including Diane Ford] were the architects and general contractors of a plan specifically designed to abuse the state's personnel system ... They not only devised the plan, they told state agencies how to execute it and threatened those who refused to go along.

> shall execute the powers and discharge the duties vested by law in the Industrial Com-

| NAME | SALARY |
|------|--------|
| Robert A. Madigan Lincoln, IL 62656 | $101,790.00 |

> Subject to confirmation, upon receipt of the Oath of Office, please issue the Commission.

\* \* \*

> This is the type of backroom, underhanded deal that has marked state government in recent years ... It's a business as usual approach that has been winked at and allowed to go unchecked, but will not be allowed in my administration.

Also on April 14, 2003, Governor Blagojevich held a press conference and stated:

> On March 6, I announced disciplinary proceedings against 40 top level employees from the Ryan Administration who last year improperly sought to lock in their State employment. These employees resigned from their jobs, they signed paperwork resigning their positions, but, in fact, never left their jobs. They got appointed to new jobs for four days, resigned those jobs, and then got placed back in their old jobs with new four-year terms. All of this took place on paper, but not in real life.

\* \* \*

> Today I am taking action against those who were the architects and masterminds behind this scheme. A scheme that manipulated—a scheme that manipulated and abused a personnel code in an effort to lock in these 40 employees into new four-year terms. The investigation conducted by the Office of the General Counsel has concluded that Diane Ford, currently a member of the Illinois Industrial Commission and Governor Ryan's former General Counsel, was the architect, the prime mover, and

> mission until the permanent appointment can be made:

| EXPIRATION DATE | POSITION FORMERLY HELD BY |
|-----------------|---------------------------|
| 1/17/2005 | Mike Weaver |

*Defendant's Exh. 1,* hearing on Motion for Preliminary Injunction (d/e 9).

the mastermind behind this plan. This morning, I terminated her.

*Transcript of Press Conference*, pp. 1–2, Exh. 9 to Memorandum in Support of Defendant's Motion for Summary Judgment.

In response to a question of whether any criminal activity had been found, Governor Blagojevich stated:

I remember from law school, Andy, that there is two types of fraud. There's civil fraud and there's criminal fraud. We are not conducting a witch hunt. We're not interested in seeing people who have sort of abused the system prosecuted criminally unless the evidence is clear that they've committed crimes. We have no evidence of that in this particular case.

*Id.*, p. 4.

On April 21, 2003, Ford filed this law suit. She also sought a preliminary injunction to enjoin Governor Blagojevich from removing her from her position on the Illinois Industrial Commission and from replacing her on that Commission. After an evidentiary hearing, the Court denied the motion for preliminary injunction. *See Order of May 8, 2003* (d/e 14).

Governor Blagojevich argues that he is entitled to summary judgment (1) because Ford had no property interest in the Industrial Commission position because she was never properly appointed to it and (2) because her claim of a deprivation of a liberty interest does not rise to one recognized by law. As alternative arguments for summary judgment, Governor Blagojevich argues that: (1) Ford's due process claim fails because she has not disputed any of the facts set forth by Governor Blagojevich as reasons for her discharge; (2) even if she had been validly appointed to the position, the Governor had the power under the Illinois Constitution to remove her; and (3) Ford received all of the process she was due.

Ford argues that: (1) she was lawfully appointed to the Industrial Commission position; (2) Governor Blagojevich had no just cause for removing her; (3) Governor Blagojevich terminated her without giving her notice and an opportunity for hearing; and (4) there is no basis for summary judgment on Count II (liberty interest). Ford agrees, however, that for Count II to stand, she must have been lawfully appointed to her position on the Illinois Industrial Commission. *Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment*, p. 16.

The Court adopts its reasons cited in denying the preliminary injunction in finding that Ford was not properly appointed to the Illinois Industrial Commission and thus had no property right in the position. Since Ford concedes that a lawful appointment would be necessary for her to prevail on Count II, the Court allows the motion for summary judgment on both counts of the complaint.

## ANALYSIS

In evaluating a motion for summary judgment, the Court must consider the evidence presented in the light most favorable to the nonmoving party. Any doubt as to the existence of a genuine issue of fact for trial must be resolved against the party bringing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once Governor Blagojevich has produced evidence showing he is entitled to summary judgment, Ford must present evidence to show that issues of fact remain. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 576, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The facts in this case are not in dispute. Ford claims that she had a property interest in her position on the Commission and that she was deprived of that

interest without being afforded due process of law. She argues that under the Constitution she was entitled to notice and an opportunity to defend herself against the allegations before she could be fired because she had a property interest in her position. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Listenbee v. City of Milwaukee,* 976 F.2d 348, 351 (7th Cir. 1992). Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law...." *Loudermill,* 470 U.S. at 538, 105 S.Ct. 1487 (*quoting Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). In Illinois, "[a] person has a property interest in [her] job where [she] has a legitimate expectation of continued employment ... based on a legitimate claim of entitlement." *Draghi v. County of Cook,* 184 F.3d 689, 692 (7th Cir.1999)(*quoting Faustrum v. Board of Fire & Police Comm'rs.,* 240 Ill.App.3d 947, 181 Ill.Dec. 567, 608 N.E.2d 640, 641 (1993)).

Ford's claim of a property interest in the position of a Commissioner, therefore, must be examined in the context of the Illinois law defining the Commission and the procedure set forth in the statute for filling vacancies on it, as well as the Illinois constitutional provision defining the Governor's powers. The Commission was created by the Illinois legislature to administer the Illinois Worker's Compensation Act. 820 ILCS § 305/13. By statute, a Commissioner is appointed for a term of four years, running from the third Monday in January of the year of his appointment and until a successor is appointed and qualified. 820 ILCS § 305/13. All appointments must be made so that the com-

position of the Commission is in accordance with the requirements in paragraph one of the section. The paragraph states that the Commission consists of seven members appointed by the Governor, with the consent of the Illinois Senate. 820 ILCS § 305/13. Two members must be representative of the employing class; two members must be representative of the employee class; and three members must be citizens not identifiable with either class. *Id.* No more than four members of the Commission may be of the same political party. *Id.*[2] Ford was to serve as a public member—not identifiable with either the employing class or the employee class. If a vacancy on the Commission occurs while the Senate is in recess,

> the Governor shall make a temporary appointment until the next meeting of the Senate, when he shall nominate some person to fill such office. Any person so nominated who is confirmed by the Senate shall hold office during the remainder of the term and until his successor is appointed and qualified.

*Id.*

Under the Illinois Constitution, the Governor is authorized to nominate, by and with the advice and consent of the Senate "... all officers whose election or appointment is not otherwise provided for. Any nomination not acted upon by the Senate within 60 session days after the receipt thereof shall be deemed to have received the advice and consent of the Senate." *1970 Illinois Constitution,* Article V, § 9(a). The Constitution further provides:

> (b) If, during a recess of the Senate, there is a vacancy in an office filled by appointment by the Governor by and with the advice and consent of the Senate, the Governor shall make a tempo-

2. Both the Statute and the parties also refer to members of the Commission as "Commis-sioners."

rary appointment until the next meeting of the Senate, when he shall make a nomination to fill such office.

*1970 Illinois Constitution,* Article V, § 9(b). Finally, the Constitution provides: "The Governor may remove for incompetence, neglect of duty, or malfeasance in office any officer who may be appointed by the Governor." *1970 Illinois Constitution,* Article V, § 10.

A similar provision concerning the Governor's removal power was found in the 1870 Illinois Constitution. The Illinois Supreme Court construed that provision in the 1870 Illinois Constitution as making the Governor's removal power co-extensive with his power of appointment. *Wilcox v. People ex rel. Lipe,* 90 Ill. 186 (1878). The *Wilcox* analysis was followed by the Seventh Circuit in construing the removal power of the Governor under the 1970 Illinois Constitution. The Seventh Circuit quoted *Wilcox* as stating that once the Governor determined that he had a basis to remove someone for incompetence, neglect of duty, or malfeasance, separation of powers prohibited the courts from questioning the Governor's determination of cause. *Adams v. Walker,* 492 F.2d 1003 (7th Cir.1974). The court in *Adams* held that Adams could be removed from his six year term on the Illinois Liquor Control Commission whenever the Governor saw fit to recite the magic words, "incompetence, neglect of duty, or malfeasance in office." *Id.* at 1009.[3] The court held that *Adams* had no property right in the position. *Id.* at 1007.

Two years later, however, the Illinois Supreme Court addressed the removal power provision in the 1970 Illinois Constitution. The Illinois Supreme Court construed the language in light of the delegates' debates at the 1970 Constitutional Convention and found that the framers did not intend for the Governor to be able to remove members of the Illinois State Board of Elections without cause simply by reciting the magic words "incompetence, neglect of duty, or malfeasance in office." *Lunding v. Walker,* 65 Ill.2d 516, 3 Ill.Dec. 686, 359 N.E.2d 96 (1976). The court found in the Convention debates an intent on the part of the delegates to change then existing law, as stated in *Wilcox,* and an intent that the Governor's removal power not be absolute in all cases. *Id.* at 526, 3 Ill.Dec. 686, 359 N.E.2d 96. The court in *Lunding* analogized from certain federal cases which had addressed the President's powers and determined that like the President, the Governor as the State's executive, should have greater discretion to remove an official who was part of the Executive establishment than an official who was a part of a body called upon to exercise its judgment without interference from any other official or department of government. *Id.* at 522–525, 3 Ill.Dec. 686, 359 N.E.2d 96. The court concluded that since the State Board of Elections was constitutionally mandated and politically independent, the Governor could only remove its members for cause and that the decision of what constituted cause was judicially reviewable. *Id.* at 527–528, 3 Ill.Dec. 686, 359 N.E.2d 96. The court further limited its holding to "this particular factual setting." *Id.* at 529, 3 Ill.Dec. 686, 359 N.E.2d 96.

 Ford argues that the members of the Industrial Commission are entitled to the same protection from removal by whim of the Governor as the members of the State Board of Elections. Governor Blagojevich notes that, unlike the State Board of Elections, the Industrial Com-

---

**3.** There is no majority opinion in *Adams v. Walker,* 492 F.2d 1003 (7th Cir.1974). Judge Cummings and Judge Stevens concurred in the result, but each wrote separately. The principle cited here is from Judge Stevens' opinion.

mission is not constitutionally mandated, and the Governor should have greater discretion in removing its members. Although the Commission is not constitutionally mandated, the legislative act establishing it indicates an intent to have a neutral, bi-partisan, and independent board administer the Worker's Compensation Act. This body is charged with the function of reviewing decisions by arbitrators in worker's compensation cases. In those cases, the Commission's functions are "to assess the credibility of witnesses, resolve conflicts in the evidence, weigh the evidence, draw reasonable inferences from the evidence, and determine the questions of fact." *Meadows v. Industrial Com'n,* 262 Ill.App.3d 650, 199 Ill.Dec. 937, 634 N.E.2d 1291 (5th Dist.1994), citing *Paganelis v. Industrial Com'n,* 132 Ill.2d 468, 139 Ill.Dec. 477, 548 N.E.2d 1033 (1989). The Commission has a balance of membership politically and with respect to employee-employer-public representation. The legislative action in providing for such neutral bi-partisan membership on the Commission, coupled with the awarding of specific terms to its members, leads this Court to conclude that there are the same strong considerations for political independence for this Commission that there are for the State Board of Elections. Since political independence was the primary factor the court relied upon in its decision in *Lunding* and since political independence also is required of the Illinois Industrial Commission, this Court likewise holds that the lawfully appointed members of the Commission can only be removed for cause, and a Governor's decision removing members is subject to judicial review.

■ Consistent with that finding, the Court also finds, by implication, that those lawfully appointed as commissioners have a constitutionally protected property interest in the position. There would be no logic in requiring *cause* to remove a person from a position if there were no property interest in the position held by the officer holder.

The issue is whether Ford was a lawfully appointed member of the Commission at the time Governor Blagojevich removed her. If so, then she has a constitutionally protected property interest and a due process right under the Fifth and Fourteenth Amendments to the United States Constitution to notice and an opportunity to defend before she can be removed. On the other hand, if she was not a lawfully appointed member of the Commission at the time Governor Blagojevich fired her, then she had no constitutionally protected property interest in the position.

■ Under the Illinois Worker's Compensation Act, a member of the Commission is appointed to a term of office of four years, running from the third Monday of January of the year of the appointment and until his successor is appointed and qualified. 820 ILCS 305/13. The Act provides that:

> In case of a vacancy in the office of a Commissioner during the recess of the Senate, the Governor shall make a temporary appointment until the next meeting of the Senate, when he shall nominate some person to fill such office. Any person so nominated who is confirmed by the Senate shall hold office during the remainder of the term and until his successor is appointed and qualified.

*Id.* This language conforms with Article V, § 9(b) of the 1970 Illinois Constitution. A plain reading of these two portions of Section 13 and Article V, § 9(b) of the Illinois Constitution indicates that a temporary appointment exists only while the Senate is in recess. Once the Senate is in session and confirms the Governor's appointee, the appointment is no longer temporary, but is for the remainder of the four year term

and until the appointee's successor is appointed and qualified.

On July 3, 2002, then-Governor Ryan appointed Rink to fill the vacancy on the Commission caused by Madigan's resignation. Governor Ryan stated in the letter to Secretary of State Jesse White that he limited Rink's term of office to December 31, 2002, even though Madigan's term had run through January 17, 2005. Also on July 3, 2002, Governor Ryan appointed Ford to take Rink's position effective January 1, 2003. Ford's appointment was to last until January 17, 2005, which represented the balance of Madigan's term. The appointments of Rink and Ford were both "transmitted" to the Senate on November 21, 2002. Both were confirmed by the Illinois Senate on December 4, 2002, "to be a member of the Industrial Commission ..." *Memorandum in Support of Defendant's Motion for Summary Judgment, Exh. 4.*

Under the language of Section 13, the Senate's confirmation of Rink's appointment to Madigan's former position meant that the vacancy on the Commission was filled. By statute, once Rink's confirmation was approved by the Senate, he took over the balance of Madigan's term, which does not expire until January 17, 2005. There is nothing in Section 13 which allows the Governor to set limits to the term of office of a Commissioner approved by the Senate. The Governor may make a temporary appointment, but upon the next meeting of the Senate, the Governor is to nominate someone to fill the office. Once that nomination is confirmed by the Senate, the term of office is set by statute. The Senate approved Rink's appointment to fill Madigan's vacant seat. Accordingly, Rink took over Madigan's term, which despite Governor Ryan's limitation on Rink's term of office, did not expire until December 17, 2005. Once Rink was confirmed by the Senate for Madigan's seat, Governor Ryan had no power to appoint another

person to the position until a vacancy occurred.

Governor Ryan, however, attempted to limit Rink's term, and to appoint Ford in anticipation of a vacancy occurring in the future. According to Ford's appointment, she was to take over the position formerly held by Rink. However, Governor Ryan did not have the statutory authority to limit Rink's term of office to a portion of Madigan's unexpired term. Because Rink was never removed from the Commission after he was confirmed by the Senate and because Rink had not resigned, there was no "vacancy" on the Commission to be filled at the time Ryan designated Ford to serve on the Commission. "It is a condition precedent to power to fill a vacancy in office that such vacancy in fact exists ..." *Molnar v. City of Aurora,* 38 Ill.App.3d 580, 583, 348 N.E.2d 262, 265 (1976).

Ford argues, however, that the Court must glean Governor Ryan's intent from the language of the appointment letters and that his intent was to appoint Rink only until the Senate returned and that Ford was his actual permanent appointee to fill the vacancy. She claims Rink's confirmation by the Senate was at most an error in procedure. The Court agrees that it should determine the Governor's intent from the appointment documents, read in conjunction with the statutes and constitutional provisions setting forth the Governor's powers. The Court, however, finds from those documents that Governor Ryan's intent was to apportion the remaining balance of Madigan's appointment to two appointees, giving the first six months to Rink and the balance to Ford.

In making that finding, the Court relies on the following:

(1) Governor Ryan sent two separate appointment letters—one each for Rink and Ford. If he had intended that Rink only receive the position temporarily, until the Senate returned to session, he would

have only sent one letter indicating that Ford was to be Madigan's successor—he could have included mention that Rink was the temporary appointee, until the Senate returned, in that same letter.

(2) Governor Ryan specified an ending date to Rink's "term." A temporary appointee serves until the Senate returns and confirms the designated appointee. Since that date would be unknown to the Governor, he could not set an ending date for a temporary appointment. His designation of a specific ending date for Rink's appointment indicates an actual intent on Governor Ryan's part that Rink hold the position, other than as temporary appointee.

(3) Governor Ryan's actions in sending both nominations to the Senate simultaneously showed that he recognized Ford might be confirmed during the six months of Rink's appointment. If Rink were intended as a temporary appointee only, his term would end at the point of Ford's confirmation—in this case, on December 4, 2002. Clearly Governor Ryan intended for Rink to hold the position until January 1, 2003—beyond the date of Ford's confirmation.

(4) Governor Ryan designated Rink to fill the position formerly held by Robert Madigan and Ford to fill the position formerly held by Paul Rink. It is apparent that Governor Ryan intended for Rink to succeed Madigan and Ford to succeed Rink. That could only happen if Rink actually held the position before Ford, other than on a temporary basis. Otherwise, Ford would be listed as succeeding Madigan.

(5) The language used by Governor Ryan in making Paul Rink's "temporary" appointment was identical to that which he used in appointing Robert Madigan. Madigan's appointment letter also had reference to the party he succeeded and to a beginning and ending date. His appointment letter, like Rink's, stated it was a temporary appointment. However, it was also transmitted to the Senate; he, like Rink, was confirmed by the Illinois Senate. No one has argued that Madigan was only intended to be a temporary appointee until the Senate returned to session. The same language used by Governor Ryan in making the Madigan appointment speaks to the Governor's intent in making Rink's appointment.

(6) Both the letter from Governor Ryan appointing Ford and the letter from Governor Ryan appointing Rink end with the sentence: "Subject to confirmation, upon receipt of the Oath of Office, please issue the Commission." This statement indicates Governor Ryan contemplated having each confirmed—which is unnecessary for a temporary appointee.

In sum, it appears clear that Governor Ryan intended to apportion Madigan's unexpired term. He intended that Rink hold Madigan's position on the Commission for roughly six months and that Ford hold the position for the balance of the unexpired term. However, Illinois does not authorize the Governor to make the appointments in that manner. The first person confirmed for a particular vacancy holds office by law during the remaining unexpired term. 820 ILCS § 305/13.

The policy reasons Ford argues as a rationale why Governor Blagojevich could not fire her without cause also demonstrate why Governor Ryan could not appoint her in the manner he attempted. If a Governor could truncate the term of appointment into small segments, review how an appointee rules before deciding to extend the appointment for the balance of the term, or appoint another person part way through the stated term, then the goal of an independent board or commission would be unattainable.

In a similar situation, the Oklahoma Supreme Court held that its governor could

not fill a position that was not vacant. *Abitbol v. Priore,* 797 P.2d 335 (Okla.1990). In *Abitbol,* the Oklahoma Governor appointed an acting district attorney, until a permanent one was "appointed and qualified or elected and qualified, whichever occurs earlier." *Id.* at 336. One month later the Governor appointed a second individual to fill the remainder of the unexpired term. *Id.* The Oklahoma Supreme Court noted that Oklahoma law clearly mandated that upon resignation of a district attorney, the Governor, " *'shall appoint a qualified person to serve the balance of the unexpired term'* of the office." *Id. (quoting* Okla. Stat. tit. 19, § 215.9 (1987)) (emphasis in opinion). This provision echoed the general appointment power which provides that " *'[e]very appointed officer shall hold his office until the end of the term* for which the officer whom he succeeds was elected or appointed, *and until his successor is elected and qualified.'"* *Id. (quoting* Okla. Stat. tit. 51, § 15 (1981)) (emphasis in opinion). Because of these statutory restrictions, the Oklahoma Court concluded that the governor's power to fill vacancies created by resignation, "does not include the authority to limit or condition the term during which the appointee is to serve." *Id.* at 337. Once the governor filled the vacancy, the position became *"irrevocably* filled by force of law *for the term's remainder."* *Id.* (emphasis in original). The Court concluded that the first named replacement was the appropriate district attorney.

The Oklahoma case did not involve confirmation of the appointment by a legislative body. However, once the appointment was finalized, the replacement district attorney's term was the balance of the term of the original district attorney. Similarly, once Rink's appointment was finalized, i.e. confirmed by the Senate, his term of office was the balance of Madigan's term.

Section 13 does not authorize the Governor to appoint more than one individual to a vacant position and apportion the term. There is no authority allowing him to do so absent any amendment of the Act by the General Assembly. The Senate's act in confirming an invalid appointment cannot validate an action which is in contravention of the statute. The process to change the statute is a legislative amendment, which the Senate could not enact on its own. The Illinois House would also have to concur in passing the amendment. Governor Ryan's effort to appoint two people simultaneously to the same position and apportion the unexpired term between them violated the statute. The fact that the Illinois Senate confirmed Rink and Ford for the durations listed in Governor Ryan's appointment letters does not transform Ford's invalid appointment into a valid one.

In conclusion, Rink's appointment to fill Madigan's position was confirmed by the Senate, which by statute meant Rink was to serve the balance of Madigan's term. Governor Ryan's attempted limitation on the duration of Rink's term was invalid, and Rink did not resign his position. Therefore, there was no vacancy for Ford to fill. Because there was no vacancy to fill, Ford's appointment to replace Rink violated Section 13. It follows that since Ford's appointment to the Industrial Commission was in violation of Illinois law, she did not have a valid entitlement to the position or a legitimate expectation of continued employment with the Commission. Since she has not shown such an expectation, Ford does not have a valid property interest in employment with the Commission. Finally, since Ford concedes that her liberty interest claim fails if she lacked a valid appointment to the Industrial Commission, the Court also allows Governor Blagojevich's motion for summary judgment on her liberty interest claim.

THEREFORE, the Court allows Defendant's Motion for Summary Judgment (d/e 20). This case is closed.

IT IS THEREFORE SO ORDERED.