NOTICE
Decision filed 09/08/17. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2017 IL App (5th) 160474

NO. 5-16-0474

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| ERIC E. GREGG, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Saline County. |
| | ) | |
| v. | ) | No. 15-L-29 |
| | ) | |
| BRUCE RAUNER, Governor of Illinois, | ) | Honorable |
| | ) | Todd D. Lambert, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court, with opinion.
Justice Barberis concurred in the judgment and opinion.
Justice Overstreet dissented, with opinion.

**OPINION**

¶ 1    The plaintiff, Eric Gregg, filed a complaint against the defendant, Illinois Governor Bruce Rauner (Governor Rauner), to challenge his removal from the Illinois Prisoner Review Board (IPRB). Governor Rauner moved to dismiss the complaint, arguing, in pertinent part, that his decision to remove Gregg from the IPRB was not judicially reviewable. The trial court denied the motion to dismiss, finding that Governor Rauner's decision was reviewable under the Illinois Supreme Court's decision in *Lunding v. Walker*, 65 Ill. 2d 516 (1976), because the IPRB is a quasi-judicial board, independent from the executive branch. Following a trial on Gregg's complaint, the court concluded that Gregg was wrongfully

1

terminated and entered an injunction prohibiting Governor Rauner from interfering or preventing Gregg from exercising his appointed duties with the IPRB and barring Governor Rauner from appointing Gregg's replacement. For the reasons that follow, we reverse and remand for further proceedings.

¶ 2    In May 2012, Governor Patrick Quinn nominated Gregg to be a member of the IPRB. At that time, the Governor's office provided Gregg with a statement of economic interests form to complete, which related to his income and any gifts he had received in 2011. On May 20, 2012, Gregg returned the completed form in which he wrote "None" in the space provided to identify any gift valued over $500.

¶ 3    Gregg was not appointed to the IPRB until April 26, 2013, because he was recovering from an illness. Upon his appointment, the Governor's office filed his May 2012 statement of economic interests form with the Illinois Secretary of State's office. He did not complete a statement of economic interests form for calendar year 2012.

¶ 4    In September 2013, during Governor Quinn's administration, Charles Will notified a senior legal advisor in the Illinois Department of Corrections that Gregg had failed to list income and a gift received on his statement of economic interests form. According to Will, Gregg had received a medical lift chair as a gift on April 4, 2013, which was not reported on his statement of economic interests form. Ken Tupy, the IPRB's legal counsel at the time, investigated these complaints, but neither the IPRB nor the Governor's office took any action. On November 7, 2013, the Illinois Senate approved Gregg's appointment for a six-year term to end on January 21, 2019.

2

¶ 5     On December 8, 2014, Gregg filed for Chapter 13 bankruptcy. On December 22, 2014, his bankruptcy attorney filed a form entitled "Chapter 13 Statement of Your Current Monthly Income and Calculation of Commitment Period," which indicated that Gregg had received a net monthly income of $4027 from operating a business. Gregg signed the document under penalty of perjury, declaring that the information on the form was true and correct.

¶ 6     Tupy received a letter from a Belleville News-Democrat reporter, inquiring as to whether the $4027 net income listed on Gregg's bankruptcy filing constituted a violation of section 3-3-1(b) of the Unified Code of Corrections (730 ILCS 5/3-3-1(b) (West 2014)), which prohibits IPRB members from engaging in any other business or employment.

¶ 7     In August 2015, Gregg's attorney filed an amended Chapter 13 statement of current monthly income form, which attributed the monthly business income to Gregg's wife. On September 16, 2015, Gregg received a letter from Jason Barclay, General Counsel for the Governor's Office, informing him that the Governor's office had received complaints that he had violated the terms of his appointment by receiving outside income and by filing an inaccurate statement of economic interests form.

¶ 8     On September 20, 2015, Gregg sent a letter to Barclay, explaining that his bankruptcy was triggered due to delinquent medical bills, that his bankruptcy attorney had inadvertently placed his wife's business's income in "[his] column" on the bankruptcy filing, and that his attorney had acknowledged the clerical error and had filed an amended form to correct the error. The letter also addressed the allegations that he had filed an inaccurate statement of economic interests form. Specifically, the letter explained that a community fundraiser was

3

held on his behalf to offset the cost of his medical bills; that the raised funds were placed in an account with a local church, and he did not have access to the account; that he did not know how much each person had contributed; that the statement of economic interests form was completed on May 20, 2012, during his illness and recovery but before he received the medical lift chair as a gift; and that the information from the Belleville News-Democrat appeared to be supplied by an individual who was terminated from his city employment while Gregg was mayor.

¶ 9    On October 2, 2015, Governor Rauner terminated Gregg's appointment with the IPRB for malfeasance or complete incompetence and neglect of duty, explaining that Gregg's response acknowledged and constituted an admission that he had filed a false statement under oath in federal bankruptcy proceedings and that his 2012 statement of economic interests form—which included a verification that the information contained therein was true, correct, and complete—was incorrect.

¶ 10    Gregg then filed a complaint, seeking a declaration that his removal was not for cause and requesting an injunction reinstating him. Governor Rauner filed a motion to dismiss the complaint, arguing, among other things, that his decision to remove Gregg from the IPRB was not judicially reviewable because the IPRB is part of the executive branch of government and his decisions with respect to boards under this authority are not subject to judicial review. On June 9, 2016, the trial court entered an order by docket entry, finding that Governor Rauner's decision to remove Gregg was reviewable under the Illinois Supreme Court's decision in *Lunding v. Walker*, 65 Ill. 2d 516 (1976), because the IPRB, though a

4

part of the executive branch, is a quasi-judicial board that is independent of the executive branch.

¶ 11 Following the trial held on Gregg's complaint, the trial court entered a written order on September 26, 2016, reiterating its previous decision that Governor Rauner's decision to remove Gregg from the IPRB was judicially reviewable and concluding that Gregg was wrongfully terminated because his conduct did not constitute malfeasance, neglect of duty, or incompetence and, thus, did not amount to "cause" under article V, section 10, of the Illinois Constitution (Ill. Const. 1970, art. V, § 10) or section 3-3-1(c) of the Unified Code of Corrections (730 ILCS 5/3-3-1(c) (West 2014)). Governor Rauner appeals.

¶ 12 On appeal, Governor Rauner argues that his decision to remove Gregg from the IPRB is not judicially reviewable. Alternatively, he argues that Gregg's removal for cause was valid. Because we conclude that the Governor's removal authority is not judicially reviewable, we need not address Governor Rauner's alternative argument.

¶ 13 The Illinois Constitution grants the Governor the authority to nominate and, with the advice and consent of the Illinois Senate, to appoint "all officers whose election or appointment is not otherwise provided for." Ill. Const. 1970, art. V, § 9(a). The Governor also has the authority to "remove for incompetence, neglect of duty, or malfeasance in office any officer who may be appointed by the Governor." Ill. Const. 1970, art. V, § 10. Also, the statute creating the IPRB allows the Governor to remove any member "for incompetence, neglect of duty, malfeasance or inability to serve." 730 ILCS 5/3-3-1(c) (West 2014).

¶ 14 The Illinois Supreme Court set forth the general rule that once the Governor has determined that he has a basis to remove someone for incompetence, neglect of duty, or

5

malfeasance, separation of powers prohibits the courts from questioning the Governor's determination of cause. *Wilcox v. People ex rel. Lipe*, 90 Ill. 186, 205 (1878). In making this decision, the court noted that not only does the Illinois Constitution divide the three distinct branches of government, but it also expressly prohibits the exercise of any of the power properly belonging to one by either of the others. *Id.*

¶ 15    In *Lunding*, the supreme court revisited the *Wilcox* decision in light of the 1970 Illinois Constitution[1] and concluded that a member of a board that required complete independence from executive control to perform his quasi-judicial obligations is entitled to seek judicial review of the Governor's exercise of his constitutional removal authority. *Lunding*, 65 Ill. 2d at 518, 527-28. There, plaintiff, who was a member of the State Board of Elections (Board of Elections), which is charged with the supervision of election laws and administration of registration, was removed from his part-time appointed position by the Governor for "neglect of duty." *Id.* at 518, 527-28. The court analogized a trilogy of federal cases[2] that defined the limits of the President's removal power and determined that the Governor should have greater discretion to remove an official "[w]ithin the executive branch itself" than those whose tasks require absolute freedom from executive control. *Id.* at 523-24.

¶ 16    The court concluded that, because of the unique character of the Board of Elections, the Governor could only remove a board member for cause and that the determination of the

---

[1] The removal provision set forth in the 1970 Illinois Constitution was carried over from the 1870 Constitution with only minor changes. The delegates at the 1970 Constitutional Convention recognized the *Wilcox* rule when determining the Governor's removal authority.

[2] The three federal cases discussed by *Lunding* are *Myers v. United States*, 272 U.S. 52 (1926), *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and *Wiener v. United States*, 357 U.S. 349 (1958).

adequacy of cause is judicially reviewable. *Id.* at 518-19. In support of its decision that the Governor's removal power should not be absolute, the court examined the constitutional debates at the 1970 Constitutional Convention where the delegates discussed the creation of the Board of Elections. *Id.* at 526-27. The court found that the delegates contemplated that the Board of Elections would be a highly independent board and not amenable to political influence or discipline in the discharge of their official duties. *Id.* at 527. In other words, the court concluded that the Board of Elections was to be nonpartisan and neutral because the integrity of the election process required neutrality in the administration of elections. *Id.* at 526-27.

¶ 17    The court further noted that the Board of Elections—unlike most other State agencies, boards, and commissions—is constitutionally mandated and that the Illinois Constitution requires that no political party shall have a majority of members on the Board of Elections. *Id.* at 526. The court concluded that if the *Wilcox* holding were extended and applied to the removal of the Board of Elections' members, "the political independence of that body envisioned by the delegates to the constitutional convention and sought to be achieved by the legislature would be jeopardized." *Id.* at 527. The court recognized the *Wilcox* rule and reiterated that the Governor's judgment to remove an appointed officer would not be subject to judicial challenge where the removed executive officer was directly responsible to the Governor. *Id.* at 525-27. However, where the appointed officer needed independence to discharge quasi-judicial duties, cause for removal was judicially reviewable. *Id.* Accordingly, the court concluded that, because the Board of Elections was constitutionally mandated and politically independent, the Governor could remove its members only for cause and that the

decision of what constituted cause was judicially reviewable. *Id.* at 527-28. The court limited its holding to "this particular factual setting." *Id.* at 529.

¶ 18    Applying the *Lunding* exception, the court in *Ford v. Blagojevich* concluded that members of the Illinois Industrial Commission (Industrial Commission) are entitled to the same protection from removal at the Governor's whim as members of the Board of Elections. *Ford v. Blagojevich*, 282 F. Supp. 2d 898, 905 (C.D. Ill. 2003). The court concluded that, although the Industrial Commission is not constitutionally mandated, the legislative act establishing it indicates an intention to create a neutral, bipartisan board whose duty is to administer the Worker's Compensation Act. *Id.* The court noted that the Industrial Commission has a balance of membership politically and that it is charged with reviewing arbitrator decisions in worker's compensation cases, which requires it to assess witness credibility, resolve conflicts in evidence, weigh evidence, draw reasonable inferences from the evidence, and determine questions of fact. *Id.* Thus, the court concluded that because "political independence was the primary factor" the *Lunding* court relied upon and those "same strong considerations for political independence" exist in the case before it, the Industrial Commission members can only be removed for cause, and a Governor's removal decision is subject to judicial review. *Id.*

¶ 19    Here, finding *Lunding* dispositive, the trial court concluded that members of the IPRB are entitled to the same protection from removal as the members of the Board of Elections and that Governor Rauner's decision to remove Gregg for cause was subject to judicial review. We disagree.

8

¶ 20    Like the Industrial Commission, the IPRB is not constitutionally mandated. Section 3-3-1 of the Unified Code of Corrections (730 ILCS 5/3-3-1 (West 2014)) establishes the IPRB, and the procedures employed by the IPRB in carrying out their duties are set forth in section 1610.10 of the Illinois Administrative Code (20 Ill. Adm. Code 1610.10 *et seq.* (2014)). The IPRB is independent of the Department of Corrections and consists of 15 members appointed by the Governor with advice and consent of the Senate. 730 ILCS 5/3-3-1(a), (b) (West 2014). The members must have five years of actual experience in one or a combination of the enumerated fields, which include penology, corrections work, law enforcement, sociology, law, education, social work, medicine, psychology, and other behavioral sciences. 730 ILCS 5/3-3-1(b) (West 2014). At least six of the appointed members must have at least three years experience in "juvenile matters." 730 ILCS 5/3-3-1(b) (West 2014). No more than 8 of the 15 IPRB members may be members of the same political party. 730 ILCS 5/3-3-1(b) (West 2014).

¶ 21    The IPRB's primary functions consist of the following: being the paroling authority for sentenced persons, the board of review for revocation of sentence credit cases or reduction in credit cases, the board of review and recommendation for the Governor's exercise of executive clemency, the authority for establishing release dates for certain prisoners, the authority for setting conditions for parole and mandatory supervised release (MSR) and determining whether a violation of parole or MSR conditions warrants revocation or the imposition of other sanctions, and the authority for determining whether an aftercare release condition violation warrants revocation. 730 ILCS 5/3-3-2 (West 2014).

9

¶ 22    Gregg argues that the IPRB is a quasi-judicial body that requires independence from executive control to fulfill its statutory duties. We disagree. Unlike the Board of Elections and the Industrial Commission, there is no indication that the legislature intended the IPRB to be a neutral, bipartisan board whose duties require absolute freedom from the executive branch. The IPRB is authorized to set release dates for certain prisoners, and those decisions are not subject to judicial review. 730 ILCS 5/3-3-2.1(a), (h)(3) (West 2014). "The [IPRB] grants parole as an exercise of grace and executive discretion as limited or defined by the Illinois General Assembly in duly adopted legislation." 20 Ill. Adm. Code 1610.50(a) (2014). In making parole decisions, the IPRB is not bound by strict rules of evidence, may hear witness testimony as well as testimony from the inmate, and may consider documentary evidence. 20 Ill. Adm. Code 1610.40(b) (2014).

¶ 23    Quasi-judicial proceedings adjudicate disputed facts in a particular case. *Walters v. Department of Labor*, 356 Ill. App. 3d 785, 789 (2005). Rather than an objective adjudication of the facts, the parole-release decision is a subjective determination based on the available relevant information, which is not limited to facts admitted at the parole hearing. 20 Ill. Adm. Code 1610.50(a), (b) (2014). The parole hearing is meant "to gather information and views" and "is not an adversarial proceeding." 20 Ill. Adm. Code 1610.40(a) (2014). The parole decision differs from traditional judicial decision-making in that the decision "involves a synthesis of record facts and personal observation filtered through the experience of the decisionmaker." (Internal quotation marks omitted.) *Harris v. Irving*, 90 Ill. App. 3d 56, 61 (1980). Thus, the IPRB's parole decision-making authority is a policy

10

determination as to whether parole is justified rather than a quasi-judicial adjudication of the facts.

¶ 24    Also, regarding the IPRB's executive clemency power, the IPRB serves as a "board of review and recommendation for the exercise of executive clemency by the Governor." 730 ILCS 5/3-3-1(a)(3) (West 2014). The Governor's executive clemency powers are extremely broad and cannot be controlled by either the courts or the legislature. *People ex rel. Madigan v. Snyder*, 208 Ill. 2d 457, 473 (2004). Although the IPRB advises the Governor regarding clemency petitions, the Governor's clemency decisions are left wholly to his discretion. Once the Governor makes a decision on a clemency application, he communicates that decision to the IPRB. 730 ILCS 5/3-3-13(d) (West 2014). Thus, the IPRB acts as an advisor to the Governor, and the IPRB's relationship to the Governor in the executive clemency process establishes that it is not an independent agency but a traditional part of the executive branch.

¶ 25    Although we recognize that the IPRB does perform some quasi-judicial functions, those duties do not make the IPRB a quasi-judicial agency for which political independence is necessary for the integrity of its processes. If the exercise of some judicial functions were sufficient to fall within the *Lunding* exception, the exception would quickly subsume the *Wilcox* rule. Thus, the exercise of some quasi-judicial duties by itself is insufficient to remove the agency from *Wilcox*'s general rule of judicial nonreviewability and place it within the *Lunding* exception. "An entity with quasi-judicial powers is not, as a matter of law, a quasi-judicial body at all times." *Parrillo, Weiss & Moss v. Cashion*, 181 Ill. App. 3d 920, 926 (1989).

11

¶ 26    In support of his argument that the IPRB is an agency that requires complete executive independence, Gregg analogizes the IPRB to the Federal Trade Commission (Commission), which is the subject of the United States Supreme Court's decision in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). The issue in *Humphrey's* was whether the President's removal power was limited to removal for cause. *Id.* at 619. The Court evaluated the Commission's duties—which included issuing complaints, giving notice of hearings, issuing written reports, and issuing cease and desist orders—and concluded that the Commission "is an administrative body created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative or as a judicial aid." *Id.* at 620, 628. Thus, the Court found that such a body could not be characterized "as an arm or an eye of the executive." *Id.* at 628.

¶ 27    The Court further concluded that the Commission was meant to be nonpartisan; that it must, from the very nature of its duties, act with entire impartiality; that it was charged with the enforcement of no policy except the policy of law; and that its duties were neither political nor executive but predominantly quasi-judicial and quasi-legislative. *Id.* at 624. Thus, the Court concluded that the congressional intent was to "create a body of experts who shall gain experience by length of service—a body which shall be independent of executive authority, except in its selection, and free to exercise its judgment without the leave or hindrance of any other official or any department of the government." (Emphasis omitted.) *Id.* at 625-26. Accordingly, the Court determined that no removal could be made during the

12

prescribed term for which the officer is appointed, except for one or more of the causes set forth in the applicable statute. *Id.* at 632.

¶ 28 The IPRB is distinguishable from the Commission because the IPRB acts as an agent of the executive branch by performing executive functions and aids in the exercise of traditional executive power. Also, the IPRB is not an agency that requires complete freedom from executive control to perform its statutory obligations. *Lunding* created a narrow exception to the *Wilcox* rule for appointed board members who required complete political independence to discharge their statutory obligations because executive influence would undermine the decisions made in the exercise of those obligations. Because the IPRB does not fall within the *Lunding* exception, we conclude that its members are removable by virtue of the Governor's removal power set forth in the Illinois Constitution (Ill. Const. 1970, art. V, § 10), and section 3-3-1(c) of the Unified Code of Corrections (730 ILCS 5/3-3-1(c) (West 2014)), and that a removal decision is not subject to judicial review.

¶ 29 For the foregoing reasons, we reverse the judgment of the circuit court of Saline County and remand for further proceedings in accordance with this decision.

¶ 30 Reversed and remanded.

¶ 31 JUSTICE OVERSTREET, dissenting.

¶ 32 For the following reasons, I respectfully dissent. The authority of the Governor to appoint members of the IPRB does not arise from section 9 of the Illinois Constitution, which involves appointments "not otherwise provided for." Ill. Const. 1970, art. V, § 9(a).

13

Instead, the appointment and the removal of members of the IPRB are provided for in section 3-3-1 of the Unified Code of Corrections. See 730 ILCS 5/3-3-1(b) (West 2014) (IPRB "shall consist of 15 persons appointed by the Governor by and with the advice and consent of the Senate"); 730 ILCS 5/3-3-1(c) (West 2014) ("Any member may be removed by the Governor for incompetence, neglect of duty, malfeasance or inability to serve."). The Governor's authority to appoint and remove members of the IPRB is consistent with the IPRB's role as board of review and recommendation for the exercise of executive clemency by the Governor. 730 ILCS 5/3-3-1(a)(3) (West 2014). However, this task is but one of the functions of the IPRB. Indeed, the supreme court has described the responsibilities of the IPRB as "two separate and distinct functions. One is to act as the Governor's agent in hearing applications for executive clemency, in which the Board has no power to grant a pardon, reprieve or commutation, but merely to submit a recommendation to the Governor, who is free to accept or reject the recommendation." *People ex rel. Abner v. Kinney*, 30 Ill. 2d 201, 205 (1964); see also 730 ILCS 5/3-3-1(a)(3) (West 2014). "The other is when it sits as an administrative body with the power to make final decisions in parole matters. The latter power has been granted it by the legislature." *Kinney*, 30 Ill. 2d at 205; see also *Hill v. Walker*, 241 Ill. 2d 479, 486 (2011) (IPRB "is an administrative agency created by the legislature" that determines, *inter alia*, "whether an eligible inmate should be granted or denied parole"); 730 ILCS 5/3-3-1(a)(1), (1.5), (2), (4), (5) (West 2014).

¶ 33    With regard to the IPRB's role as an administrative body with the power to make final decisions in parole matters, the legislative language reveals an intent to create an independent board that is quasi-judicial in nature, tasked with hearing and deciding parole

matters. See *People ex rel. McGee v. Hill*, 350 Ill. 129, 134 (1932) (Board of Pardons and Paroles is vested with "quasi-judicial power"); *Brown v. Duncan*, 361 Ill. App. 3d 125, 131 (2005) ("Quasi-judicial hearings are those which concern agency decisions affecting a small number of people on individual grounds based on a particular set of disputed facts that have been adjudicated."); *Cashion*, 181 Ill. App. 3d at 926 (a quasi-judicial body exercises judgment and discretion, hears and determines facts and decisions, makes binding orders and judgments, affects personal rights of private persons, and imposes penalties). The IPRB is tasked with hearing and deciding aftercare release for juveniles adjudicated delinquent; reviewing cases involving revocation, suspension, or reduction of sentence; establishing release dates; setting conditions for parole, mandatory supervised release, and aftercare release; and determining whether a violation of those conditions warrants revocation. See 730 ILCS 5/3-3-1(a)(1), (1.5), (2), (4), (5) (West 2014); see also 730 ILCS 5/3-3-2(a)(1)-(11) (West 2014) (IPRB shall, *inter alia*, conduct hearings and decide conditions, time of discharge, and revocation of parole and mandatory supervised release; conduct hearings and impose sanctions for violations of parole, mandatory supervised release, and aftercare release; conduct hearings and decide time and conditions of aftercare release; conduct hearings and decide cases for violations of Department of Corrections rules with respect to sentence credits; and conduct hearings and decide release dates for certain prisoners). Indeed, the IPRB's "mission is to function under statutory authority as a quasi-judicial body with a primary focus on public safety" (www.illinois.gov/prb (last visited Aug. 23, 2017)). See *Rodriguez v. Illinois Prisoner Review Board*, 376 Ill. App. 3d 429, 430 (2007) (court may take judicial notice of information department has provided on its official website). The

15

parole considerations before the IPRB are to be adjudicated on the merits of each claim by a body free from control or coercive influence. See *Lunding*, 65 Ill. 2d at 524.

¶ 34    Like the State Board of Elections in *Lunding* and the Industrial Commission in *Ford*, the IPRB was established to be neutral, bipartisan, and independent in the performance of its significant responsibilities. See 730 ILCS 5/3-3-1(a) (West 2014) (IPRB is independent of the Department of Corrections); 730 ILCS 5/3-3-1(b) (West 2014) (no more than 8 of 15 IPRB members may be members of the same political party). The legislative action in providing for neutral bipartisan membership on the IPRB (730 ILCS 5/3-3-1(b) (West 2014)), coupled with the awarding of specific terms to its members (730 ILCS 5/3-3-1(c) (West 2014)), are strong considerations for political independence for the IPRB. See *Lunding*, 65 Ill. 2d at 527-28; *Ford*, 282 F. Supp. 2d at 905. This need for political independence to discharge quasi-judicial duties supports the conclusion that the members of the IPRB can only be removed for cause, *i.e.*, "incompetence, neglect of duty, malfeasance or inability to serve" (730 ILCS 5/3-3-1(c) (West 2014)), and a Governor's decision removing an IPRB member is subject to judicial review. See *Ford*, 282 F. Supp. 2d at 905; see also *Kosoglad v. Porcelli*, 132 Ill. App. 3d 1081, 1088 (1985) (because the Board of Fire and Police Commissioners, like State Board of Elections in *Lunding*, was intended by the General Assembly to be " 'neutral, bipartisan[,] and independent,' " the statutory scheme authorized judicial review of the adequacy of the cause for removal of its members). Thus, I would conclude that the adequacy of the cause for removal cited by the Governor is judicially reviewable.

2017 IL App (5th) 160474

NO. 5-16-0474

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| ERIC E. GREGG, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Saline County. |
| | ) | |
| v. | ) | No. 15-L-29 |
| | ) | |
| BRUCE RAUNER, Governor of Illinois, | ) | Honorable |
| | ) | Todd D. Lambert, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

**Opinion Filed:**       **September 8, 2017**

_____

**Justices:**       Honorable Thomas M. Welch, J.

           Honorable John B. Barberis, J.,
           Concurred
           Honorable David K. Overstreet, J.,
           Dissented

_____

**Attorneys**       Lisa Madigan, Attorney General, State of Illinois, David L. Franklin,
**for**       Solicitor General, Brett E. Legner, Deputy Solicitor General, 100
**Appellant**       West Randolph Street, 12th Floor, Chicago, IL 60601

_____

**Attorney**       Thomas F. Crosby, Winters, Brewster, Crosby, and Schafer, LLC,
**for**       111 West Main, P.O. Box 700, Marion, IL 62959
**Appellee**

_____